985 P.2d 262 (1999)
138 Wash.2d 699
C.J.C., Respondent,
v.
CORPORATION OF the CATHOLIC BISHOP OF YAKIMA, a sole corporation; Father Richard Scully; and Father Dale Calhoun, Petitioners.
Juanita Funkhouser, a married woman; Sheri Lewis, a married woman; and Janelle Larson, a married woman, Respondents,
v.
David Wilson, as personal representative for the Estate of Orin Wilson; Gerry Wilson, a single woman; David Schulz; Calvary Baptist Church of Twisp, Washington, formerly known as Calvary Bible and/or First Baptist Church, the Columbia Baptist Conference, a Washington corporation, Petitioners.
E.R.B., a single person, and John Bales and Jody Bales, husband and wife, Petitioners,
v.
Church of God, a Washington corporation; and Rick Shaw and "Jane Doe" Shaw, husband and wife; A B C Church of God and X Y Z Church of God, Respondents.
Nos. 66252-5, 66580-0, 65654-1.
Supreme Court of Washington, En Banc.
Argued September 22, 1998.
Decided July 29, 1999.
As Amended September 8, 1999.
*265 Debra Stephens, Bryan Harnetiaux, Spokane, Amicus Curiae on Behalf of Washington State Trial Lawyers Association.
Andrew L. Subin, Vashon, Amicus Curiae on Behalf of Northwest Womens Law Center.
Thomas West, Martin Burns, Tacoma, Sheryl Willert, Mary Spillane, Nancy Harriss, David Smith, Michael Bolasina, Kenneth Hobbs, Stephen Larson, Thomas Frey, Keith Kemper, Mary Kinerk, Neil Cable, Seattle, Lee Kraft, Joel Salmi, Bellevue, for Petitioners.
Sandra Bobrick, Tacoma, Stephen Hansen, Paul McConnell, James Rogers, Mary Fleck, Stewert Estes, James Dixon, Robert Dickerson, David Jacobi, Seattle, Frederic Fancher, Spokane, for Respondents. *263
*264 JOHNSON, J.
In these consolidated cases we are asked to determine the scope of RCW 4.16.340, the statute of limitations applicable to civil claims "based on" intentional childhood sexual abuse. Specifically, we must decide whether negligence claims brought against church entities and individual church officials who did not themselves directly perpetrate intentional acts of childhood sexual abuse, but who allegedly failed to protect the child victims or otherwise prevent the abuse, fall within the broad limitations period allowed under the statute.
We answer in the affirmative.[1] Each case also raises questions specific to the individual case. These questions are answered after the common question is addressed.

FACTS[2]
Plaintiff C.J.C. was an altar boy at St. Paul's Parish of the Corporation of the Catholic Bishop of Yakima (Diocese). C.J.C. alleges that two priests, Fathers Scully and Calhoun, sexually molested him on separate occasions during the years 1980 through 1981, when he was 15 and 16 years old, respectively. The abuse consisted of fondling and masturbatory acts performed on C.J.C. by the priests. C.J.C. claims the Diocese was aware of the risk Fathers Scully and Calhoun presented before the abuse occurred, but did nothing to prevent it.
Plaintiffs Juanita Funkhouser, Sheri Lewis, and Janelle Larson are sisters whose father was a pastor at the Calvary Baptist Church of Twisp (Church) between 1969 and 1973, and again between 1978 and 1989. Orin Wilson was a prominent member and one-time deacon of the Church. The sisters claim they were sexually molested on multiple occasions by Wilson when they were children. (Wilson has since died and his estate has been substituted). Sheri and Janelle, the older sisters, allege they were molested between the years 1969 and 1973. Juanita claims she was molested on four occasions, the first occurring between 1970 and 1971, and on three other occasions between 1978 and 1980. In written letters before his death, Wilson admitted to the abuse. The sisters claim the Church and its governing body, the Calvary Baptist Conference, had prior knowledge of Wilson's alleged abuse of other young girls but negligently failed to *266 prevent their subsequent abuse, or to otherwise warn or protect them against Wilson.
Plaintiffs E.R.B. and his parents were members of the New Life Fellowship Church of God (Local Church) in Longview. The Local Church is governed by the New Life Church of God State Offices and Parsonages. Rick Shaw became an associate pastor at the Local Church in 1985. Shaw began sexually abusing E.R.B. in 1985, when E.R.B. was 14 years old. The abuse continued until July 1990, and consisted mainly of fondling E.R.B. and performing oral sex on him. E.R.B. and his parents claim the Local Church failed to properly investigate Shaw's conduct after numerous allegations were made against him. They allege the Local Church negligently supervised Shaw, and the Local Church failed to protect E.R.B. from Shaw's sexual misconduct.
All three trial courts held RCW 4.16.340 applied only to claims against the actual perpetrator of the abuse. In all cases, the trial courts dismissed (on various grounds) all claims against church entities and members who had not themselves directly perpetrated the abuse.
In each case, the Court of Appeals affirmed the trial courts on the applicability of RCW 4.16.340, holding the statute applied only to claims against the actual abusers.[3] We address this common issue first.

ANALYSIS
RCW 4.16.340[4] reads in pertinent part:
(1) All claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within the later of the following periods:
(a) Within three years of the act alleged to have caused the injury or condition;
(b) Within three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act; or
(c) Within three years of the time the victim discovered that the act caused the injury for which the claim is brought:
PROVIDED, That the time limit for commencement of an action under this section is tolled for a child until the child reaches the age of eighteen years.
....
(5) As used in this section, "childhood sexual abuse" means any act committed by the defendant against a complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of chapter 9A.44 RCW or RCW 9.68A.040 or prior laws of similar effect at the time the act was committed.
In addition, as part of the same act, the Legislature amended RCW 4.16.350, the statute of limitations for professional negligence by health care providers. That amendment reads:
This section [RCW 4.16.350(3) ] does not apply to a civil action based on intentional conduct brought against those individuals or entities specified in this section by a person for recovery of damages for injury occurring as a result of childhood sexual abuse as defined in [RCW 4.16.340(5)]....
Laws of 1988, ch. 144, ง 2 (emphasis added).
In Jamerson v. Vandiver, 85 Wash.App. 564, 934 P.2d 1199, review denied, 133 Wash.2d 1005, 943 P.2d 663 (1997), the Court of Appeals restricted the scope of RCW 4.16.340 to claims against the actual *267 perpetrator of the alleged childhood sexual abuse. The court reasoned the statutory definition of "childhood sexual abuse," which limits the predicate conduct to acts in violation of the criminal code, precludes negligence claims against those who have not themselves committed intentional acts of sexual abuse. Jamerson, 85 Wash.App. at 567, 934 P.2d 1199. In each of the cases before us now, relying on Jamerson, the trial courts and the Court of Appeals refused to apply RCW 4.16.340 to claims brought against persons other than the actual abusers. Plaintiffs argue Jamerson was wrongly decided and should be overturned. Plaintiffs argue the language contained in RCW 4.16.340 encompasses claims of negligence against individuals and entities secondarily liable for failing to prevent the alleged abuse. We agree.
We give words in a statute their plain and ordinary meaning unless a contrary intent is evidenced in the statute. Erection Co. v. Department Labor & Indus., 121 Wash.2d 513, 518, 852 P.2d 288 (1993). Where the statutory language is clear and unambiguous, the statute's meaning is determined from its language alone; we may not look beyond the language nor consider the legislative history. Multicare Med. Ctr. v. Department of Soc. & Health Servs., 114 Wash.2d 572, 582, 790 P.2d 124 (1990). We construe an act as a whole, giving effect to all the language used. State v. S.P., 110 Wash.2d 886, 890, 756 P.2d 1315 (1988). Related statutory provisions are interpreted in relation to each other and all provisions harmonized. S.P., 110 Wash.2d at 890, 756 P.2d 1315.
We are primarily concerned with the language contained in subsection (1) and subsection (5) of RCW 4.16.340, as well as the related amendment to RCW 4.16.350. Specifically, we must decide whether the act contemplates causes of action sounding in negligence. If it does, we must then decide whether the definition of "childhood sexual abuse" contained in subsection (5) nevertheless limits the act's applicability only to claims brought by a victim against the actual perpetrator of the abuse.
Subsection (1) of RCW 4.16.340 controls the scope of the statute's applicability. The relevant language is expansive. It permits "[a]ll claims or causes of action" brought by "any person" provided only that claims be "based on intentional conduct" involving "childhood sexual abuse." RCW 4.16.340(1).
By its plain terms, the statute encompasses all causes of action "based on intentional conduct." The question is whether "based on intentional conduct" includes negligence causes of action. "Based on" is undefined in the statute. We, therefore, turn to the ordinary dictionary meaning. American Legion Post No. 32 v. City of Walla Walla, 116 Wash.2d 1, 8, 802 P.2d 784 (1991). Webster's dictionary defines "base" as "that on which something rests or stands: Foundation... the point or line from which a start is made in an action or undertaking...." Webster's Third New International Dictionary 180 (1986). Accordingly, under the plain meaning of the statute, an action is "based on intentional conduct" if intentional sexual abuse is the starting point or foundation of the claim.
We have already reached a similar conclusion regarding the meaning and effect of RCW 4.16.340. See DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 960 P.2d 919 (1998). In DeYoung, although not engaging in statutory construction per se, we recognized the statute contemplates professional negligence causes of action where "the gravamen of the action is [childhood sexual] abuse...." DeYoung, 136 Wash.2d at 147, 960 P.2d 919 (emphasis added). We noted the statute applies to medical malpractice actions where the underlying "child sexual abuse forms the grounds for the action...." DeYoung, 136 Wash.2d at 147, 960 P.2d 919 (emphasis added).
Similarly, under the facts presented here, intentional sexual abuse is the predicate conduct upon which all claims are based, including the negligence claims. The alleged sexual abuse is essentially an element of the plaintiffs' negligence claims. Absent the abuse, plaintiffs would not have suffered any injury and their negligence claims could not stand. Thus, the "gravamen" of plaintiffs' claims is that defendants are liable for injuries resulting from acts of intentional sexual *268 abuse. See DeYoung, 136 Wash.2d at 147, 960 P.2d 919. Equal to any other element of the negligence causes of action, the injury resulting from the abuse "forms the grounds" for the claims. As such, the negligence claims are "based on intentional conduct" within the meaning of the statute because they stem from injuries suffered as a result of intentional childhood sexual abuse.[5]See DeYoung, 136 Wash.2d at 146-47, 960 P.2d 919.
At least one other state court has reached the same conclusion when interpreting identical statutory language. Werre v. David, 275 Mont. 376, 386, 913 P.2d 625 (1996) (holding that negligence claim against party who herself did not engage in intentional abuse is "based on intentional conduct," because intentional sexual abuse provided the "starting point or foundation for the [negligence] claim").
We find further support to conclude RCW 4.16.340 encompasses negligence causes of action in the simultaneously enacted amendment to RCW 4.16.350. That amendment expressly provides that RCW 4.16.340 applies to the negligence of a health care provider where the claim is based on injuries suffered as a result of childhood sexual abuse. Taken as a whole, therefore, the statute is not limited in scope to intentional torts, but specifically includes negligence causes of action.
Defendants argue that RCW 4.16.340's definition of "childhood sexual abuse" necessarily limits its application to only those claims brought by "a" victim against "the" perpetrator of the abuse. RCW 4.16.340(5) (defining "childhood sexual abuse" as "any act committed by the defendant against a complainant ... and which act would have been a violation of [the applicable criminal code]").
Defendants draw our attention to two cases in which the courts of California and Rhode Island reached the result defendants argue for here. See Debbie Reynolds Prof I Rehearsal Studios v. Superior Court, 25 Cal.App.4th 222, 231, 30 Cal. Rptr.2d 514 (1994) (holding that statute of limitations, which defined "childhood sexual abuse" as any act "proscribed" under the applicable penal code, necessarily limited the statute's applicability to causes of action against defendants who had themselves perpetrated "certain intentional criminal acts prohibited by law"); Kelly v. Marcantonio, 678 A.2d 873, 875-76 (R.I.1996) (holding that statute of limitations, which defined "childhood sexual abuse" as any act by "the defendant against a complainant," and which act would have been a violation of the applicable criminal code, necessarily limited the statute's applicability to causes of action against "the" defendant who had himself engaged in the criminal conduct).
We decline to adopt the reasoning of these cases. Initially, we note the statutory definition of "childhood sexual abuse" does not on its face specifically include or exclude those persons who may bring claims, or against whom claims may be brought. Ultimately, however, we find that to read the definition of "childhood sexual abuse" as necessarily implying that claims may be brought only by the victim against the alleged abuser would deny other words contained in the statute their ordinary meaning, deprive them of meaningful effect, and create discord between related provisions of the act.
The act plainly provides that "any person" may bring claims under its provisions, not just the victim. RCW 4.16.340(1). More significantly, the act expressly includes within its scope suits against negligent entities. RCW 4.16.350. By definition, a negligent actor does not act intentionally. Furthermore, entities, ipso facto, cannot directly perpetrate sexual abuse. Entity liability is, in all circumstances, derived from the acts of its agents, whether it be under theories of respondeat superior, negligence, or other imputed conduct (civil or criminal).
Rather than a limitation on the parties who may sue or be sued under the act, we read the statutory definition of "childhood sexual abuse" as limiting only the specific *269 predicate sexual conduct upon which all claims or causes of action must be based. Thus, the alleged sexual abuse must amount to a violation of the criminal code. If it does not, no claim of any type, against any person, lies.
We find this interpretation best preserves express language contained within the act, harmonizes related provisions, and leaves intact the primary meaning of the definition of "childhood sexual abuse"โthat claims must be based on serious sexual misconduct of criminal proportions.
The defendants contend the definitional language creates ambiguity in the meaning of the statute and argue the legislative history supports their position. Even were we to agree that the statute is ambiguous, which we do not, the defendants' interpretation is contrary to the legislative intent. See Marquis v. City of Spokane, 130 Wash.2d 97, 108, 922 P.2d 43 (1996) (where language creates ambiguity in the overall meaning or purpose of the statute, this court must attempt to fulfill the legislative intent).
As noted earlier, RCW 4.16.340 was enacted in response to our decision in Tyson v. Tyson, 107 Wash.2d 72, 727 P.2d 226. In doing so, the Legislature specifically provided for a broad and generous application of the discovery rule to civil actions for injuries caused by childhood sexual abuse. See Laws of 1991, ch. 212, ง 1(6), amending RCW 4.16.340 in part to clarify the Legislature's original intent in enacting the statute ("[t]he legislature enacted RCW 4.16.340 to clarify the application of the discovery rule to childhood sexual abuse cases"). The Legislature adopted "findings and intent," which make clear that its primary concern was to provide a broad avenue of redress for victims of childhood sexual abuse who too often were left without a remedy under previous statutes of limitation. See Laws of 1991, ch. 212, ง 1 (finding that childhood sexual abuse is a pervasive problem and causes long lasting damage; that victims of childhood sexual abuse may repress the memory of the abuse or be unable to connect the abuse to any injury until the statute of limitations has run; that victims may be unable to understand or make the connection between the abuse and the emotional damages it causes; that even though victims may be aware of injuries related to the abuse, more serious injuries may be discovered many years later.).
Significantly, in 1991, the statute was broadened in order to make clear that the discovery of less serious injuries did not commence the period of limitations. In addition, the Legislature specifically superseded a line of cases that had strictly applied the discovery rule in cases involving childhood sexual abuse. Laws of 1991, ch. 212. At least one of the superseded cases, Raymond v. Ingram, 47 Wash.App. 781, 737 P.2d 314 (1987), involved negligence claims against nonabusers which had been dismissed by the court. Given this context, we conclude the Legislature intended a broad reading and application of the statute.
Nowhere in RCW 4.16.340 does the Legislature articulate concern for defendants who might be sued. If the Legislature had intended the act to apply exclusively to the perpetrators of the abuse, the statute would have included specific limitations to that effect. It does not do so.[6]
*270 In giving effect to all the words used in the statute, and from our determination of legislative intent, we conclude RCW 4.16.340 encompasses causes of action sounding in negligence against parties who did not themselves directly perpetrate acts of childhood sexual abuse, but who allegedly failed to protect child victims or to otherwise prevent the abuse.
The trial courts and Court of Appeals are reversed on this issue. Jamerson v. Vandiver, 85 Wash.App. 564, 934 P.2d 1199, is overruled.

Issues Specific to Each Case
C.J.C. v. Corporation of the Catholic Bishop
First, we must decide whether the alleged sexual misconduct of Fathers Scully and Calhoun (the Priests) constitutes "childhood sexual abuse" within the meaning of the statute. See RCW 4.16.340 (defining "childhood sexual abuse" as an act that would have been a violation of RCW 9A.44, RCW 9.68A.040, or prior laws of similar effect at the time the act was committed).
C.J.C. argues the Priests communicated with him for an immoral purpose as proscribed under former RCW 9A.44.110 (1981) ("Any person who communicates with a child under the age of seventeen years of age for immoral purposes shall be guilty of a gross misdemeanor...."). The Priests, who allegedly masturbated C.J.C, argue that RCW 4.16.340 does not apply to claims against them because their conduct was not proscribed under the then applicable criminal code.
At the time in question, 1980 through 1981, RCW 9A.44 was the applicable statute then in effect. Finding the alleged conduct did not fall under any of the definitional sections of the statute, the trial court dismissed all claims against the Priests. See RCW 9A.44.010 (defining "sexual intercourse" as penetration or contact between sexual organs of one person and vagina, mouth, or anus of another).
Relying on State v. McNallie, 120 Wash.2d 925, 846 P.2d 1358 (1993), the Court of Appeals reversed and reinstated the claims. Under McNallie, the Court of Appeals reasoned a jury could find that an act not specifically proscribed by statute could nevertheless constitute communication with a child for immoral purposes, so long as the communication was "for the predatory purpose of promoting their exposure to and involvement in sexual misconduct." C.J.C. v. Corporation of the Catholic Bishop, 88 Wash.App. 70, 75, 943 P.2d 1150 (1997) (quoting McNallie, 120 Wash.2d at 933, 846 P.2d 1358).
The Priests now argue that the Court of Appeals should not have applied the reasoning of McNallie because that case interpreted RCW 9.68A, a later enacted statute. In essence, the Priests would have this court ignore McNallie and reverse the Court of Appeals on the basis that their conduct was not then a crime and, therefore, they could not have engaged in communications for an immoral purpose. See, e.g., State v. Luther, 65 Wash.App. 424, 428, 830 P.2d 674 (1992) (no communication for immoral purpose if underlying sexual conduct not illegal).
The Priests' argument is not well taken. In 1979, we construed the very statute at issue here and concluded it applied to misconduct of a sexual nature whether or not precisely defined within the statute itself. See State v. Schimmelpfennig, 92 Wash.2d 95, 101-04, 594 P.2d 442 (1979) (construing RCW 9A.88.020).[7] We gave the phrase *271 "communication with a minor for immoral purposes" a "commonsense understanding," holding that "any spoken word or course of conduct with a minor for purpose of sexual misconduct is prohibited." Schimmelpfennig, 92 Wash.2d at 103-04, 594 P.2d 442 (emphasis added). We upheld the conviction of a man who had merely attempted to entice young girls into the back of his van for sexual purposes. Here, defendants allegedly engaged in actual sexual misconduct.
We find the Priests' conduct meets the definition of "childhood sexual abuse" as defined in RCW 4.16.340. We affirm the Court of Appeals on this issue.
Second, we must decide whether two communications sent from the Priests' mental health providers to the Diocese are privileged and undiscoverable.
C.J.C. moved the trial court to compel discovery of certain communications between mental health counselors and the Diocese regarding the treatment of Fathers Calhoun and Scully. The trial court denied the motion. The Court of Appeals affirmed in part and reversed in part. C.J.C. v. Corporation of the Catholic Bishop, No. 37632-2-I, slip op. at 20-22 (Wash.Ct.App. Sept. 22, 1997). In reversing in part, the court reasoned that two reports sent from the Priests' mental health counselors to the Diocese were discoverable because they were not confidential communications between patient and counselor. See C.J.C, No. 37632-2-I, slip op. at 21.
The fact that the Priests participated in counseling at the insistence of the Diocese and consented to the Diocese receiving reports of their progress is undisputed. Nevertheless, they argue the client-psychologist privilege was not waived because of their unique relationship with their church. The Priests liken this relationship to a husband and wife attending joint counseling. Alternatively, they argue this court should fashion a rule similar to the "joint defense" or "common interest" rule under which communications exchanged between multiple parties engaged in a common defense remain privileged under the attorney-client privilege.
Defendants' argument does not persuade us to amalgamate various evidentiary privileges in order to create the protection they seek. Legislative grants of testimonial privilege conflict with the inherent power of the courts to compel the production of relevant evidence and are, therefore, strictly construed. See, e.g., State v. Latta, 92 Wash.2d 812, 819, 601 P.2d 520 (1979); Phipps v. Sasser, 74 Wash.2d 439, 444, 445 P.2d 624 (1968); Cook v. King County, 9 Wash.App. 50, 52, 510 P.2d 659 (1973).
Even were we inclined to recognize a unity of interest between a cleric and his or her church and protect communications made in furtherance of that interest against compulsory disclosure, this is not the case in which to do so. Where childhood sexual abuse is at issue, even long established privileges do not apply. See, e.g., State v. Fagalde, 85 Wash.2d 730, 735-37, 539 P.2d 86 (1975) (client-psychologist privilege does not apply to any judicial proceeding regarding a child's injury, neglect, or sexual abuse); Dike v. Dike, 75 Wash.2d 1, 11, 448 P.2d 490 (1968) (attorney-client privilege is not absolute and exceptions to the privilege may result from a balancing of the privilege against the public interest in full disclosure of all the facts). See also State v. Waleczek, 90 Wash.2d 746, 751, 585 P.2d 797 (1978) (husband-wife privilege may be "subordinated to the overriding and paramount legislative intent to protect children from physical and sexual abuse"). Accordingly, we limit our discussion to the specific parameters of the client-psychologist privilege.[8]
RCW 18.83.110 governs the client-psychologist privilege.[9] It prohibits compulsory disclosure *272 of confidential communications only. The privilege is strictly construed. In re Welfare of Henderson, 29 Wash.App. 748, 752, 630 P.2d 944 (1981).
A person "may not claim a privilege as to communications that do not originate in the confidence that they will not be disclosed." State v. Post, 118 Wash.2d 596, 612, 826 P.2d 172, 837 P.2d 599 (1992). A patient's intent that the communication be confidential must be reasonable in light of the circumstances surrounding the communication. Post, 118 Wash.2d at 612, 826 P.2d 172. The patient's subjective expectations of confidence, while relevant, should not be given more weight than the objective evidence of the situation and circumstances in which the communication was made. Post, 118 Wash.2d at 612, 826 P.2d 172.
Here, the Court of Appeals limited discovery to only those reports actually communicated to the Diocese; it did not require disclosure of actual treatment records. While the Priests may have believed their communications would remain confidential, they clearly intended that a third party, the Diocese, would be kept informed. The courts of this state have long held that communications intended for the purpose of providing a third party with the results thereof are not confidential. See, e.g., In re Henderson, 29 Wash.App. at 752-53, 630 P.2d 944; J.N. v. Bellingham Sch. Dist. No. 501, 74 Wash.App. 49, 63, 871 P.2d 1106 (1994). As a result, we find the communications at issue are not protected under RCW 18.83.110.
We affirm the Court of Appeals and permit discovery of the two reports sent to the Diocese because they were not confidential patient-psychologist communications.
Third, C.J.C. appeals the dismissal of his respondeat superior and strict liability claims. Under the facts alleged here, these claims are governed by our recent decision in Niece v. Elmview Group Home 131 Wash.2d 39, 48, 52-58, 929 P.2d 420 (1997).
Following an extended discussion, we concluded in Niece that neither current Washington case law nor considerations of public policy favor the imposition of respondeat superior or strict liability for an employee's intentional sexual misconduct. We specifically stated, "[vicarious liability for intentional or criminal actions of employees would be incompatible with recent Washington cases rejecting vicarious liability for sexual assault, even in cases involving recognized protective special relationships." Niece, 131 Wash.2d at 55, 929 P.2d 420 (emphasis added). C.J.C.'s argument that the Priests were, from his perspective, acting within the scope of their authority does not persuade us to establish a contrary rule. Our courts have never before adopted such an approach in the present context and we decline to do so now. Compare, e.g., Thompson v. Everett Clinic, 71 Wash.App. 548, 860 P.2d 1054 (1993) (doctor was not acting within scope of employment or apparent authority when he misled patient into believing sperm sample was required and normally obtained by manually stimulating the patient to ejaculation). See also Taylor v. Smith, 13 Wash.App. 171, 177, 534 P.2d 39 (1975) (apparent authority is determined by objective test and the authority of an agent is not "`apparent' in contemplation of law, merely because it looks so to the person with whom [the agent] deals").
For these same reasons we decline to impose strict liability on a theory of quid pro quo sexual harassment. See Thompson v. Berta Enters., Inc., 72 Wash.App. 531, 538, 864 P.2d 983 (1994) (employer strictly liable for supervisor's quid pro quo sexual harassment because such harassment is impossible absent the actual or apparent authority to make employment decisions), superseded by statute on other grounds by Schonauer v. DCR Entertainment, Inc., 79 Wash.App. 808, 905 P.2d 392 (1995). On this point, we simply disagree with C.J.C.'s contention that there is no basis for distinguishing "between supervising an employee who wants to keep her job and supervising an altar boy who wants to get into heaven." C.J.C. Answer to *273 Pet. for Review at 19. Unlike the former, the latter relationship is formed entirely by religious doctrine and, in this case, by C.J.C.'s personal religious beliefs. While C.J.C. may have sincerely believed Fathers Calhoun and Scully had the power to gain him entry into heaven, and while he may have exchanged sexual favors believing it would help him get into heaven, the notion that legal liability may be premised on such beliefs is unprecedented.
We affirm the dismissal of C.J.C.'s respondeat superior and strict liability claims.

Funkhouser v. Wilson
We must first decide whether a church and its officials have a special relationship with either its workers or the children of its congregation which gives rise to a duty to take reasonable measures to prevent harm intentionally inflicted on the children by a church worker.
The alleged facts pertaining to this issue are as follows: In 1968, David Schulz, a church elder, received a telephone call while he was doing volunteer work at the Church. The exact content of the conversation is disputed. However, Schulz admits the caller identified herself, asked to speak with a person of authority within the Church, and asserted inappropriate sexual conduct by Orin Wilson (the alleged molester of the plaintiffs) toward a young girl. At the time of the call, plaintiffs were living out-of-state. By 1969, one year later, plaintiffs had moved to Washington, their father had begun his pastorship at the Church and Schulz had become the first chairman of the Church's deacon board. At the time, Schulz did nothing to warn plaintiffs or their father of the accusation, or to prevent or discourage Wilson from being involved with the youth of the church. Schulz was, however, concerned enough that he "watched, listened, and observed" Wilson. Nevertheless, Wilson was subsequently made a deacon and was entrusted with various leadership positions within the Church that allegedly provided extensive contact with and authority over children.[10]
We begin with the now well established principle that where a "special relationship" exists, a duty to protect against the intentional or criminal acts of third parties may arise. See, e.g., Nivens v. 7-11 Hoagy's Corner, 133 Wash.2d 192, 200, 943 P.2d 286 (1997); Niece, 131 Wash.2d at 43, 929 P.2d 420. A special relationship between the defendant and the intentional tortfeasor may give rise to a duty to control the tortfeasor's conduct for the benefit of third persons. See Niece, 131 Wash.2d at 43, 929 P.2d 420. A special relationship between the defendant and the victim may give rise to a duty to protect the victim against foreseeable harms, including harms intentionally caused. "Many special relationships give rise to a duty to prevent harms caused by the intentional or criminal conduct of third parties." Niece, 131 Wash.2d at 44, 929 P.2d 420. Thus, for instance, a school has a duty to protect students within its custody from reasonably anticipated dangers, an innkeeper has a duty to protect its guests, and a hospital its patients. See Niece, 131 Wash.2d at 44-5, 929 P.2d 420 (citing cases). Similarly, even where an employee "is acting outside the scope of employment, the relationship between employer and employee gives rise to a limited duty, owed by an employer to foreseeable victims, to prevent the tasks, premises, or instrumentalities entrusted to an employee from endangering others." Niece, 131 Wash.2d at 48, 929 P.2d 420.
Whether there is a special relationship between a church and the children of its congregation that gives rise to a duty to protect the children against foreseeable harms is an issue of first impression. In important aspects, however, the activities of a church generate the kind of relationships where we have, in other contexts, imposed a *274 duty of reasonable care. The children of a congregation may be delivered into the custody and care of a church and its workers, whether it be on the premises for services and Sunday school, or off the premises at church sponsored activities or youth camps. As in other agency relationships, a church chooses its officials, directs their activities, and may restrict and control their conduct. In many respects, the activities of a church, and the corresponding duties legitimately imposed upon it, are similar to those of a school. As a matter of public policy, the protection of children is a high priority. In general, therefore, we find churches (and other religious organizations) subject to the same duties of reasonable care as would be imposed on any person or entity in selecting and supervising their workers, or protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm.
Under the facts of this case, the more difficult question is whether the harm sought to be prevented fell within the scope of any duty. Here, plaintiffs do not allege the molestation perpetrated by Wilson occurred on Church premises or during Church activities. Nor do plaintiffs claim the victims were, at the time of the molestation, specifically within the protective custody of the Church. Nevertheless, plaintiffs assert the Church had a duty to protect the children of its congregation against foreseeable harms perpetrated by a Church official whom the Church "placed in authority and in close relationship to church children, knowing of the danger." Funkhouser Supp. Br. at 7.
On these facts, the trial court found no duty existed and dismissed the claims of Janelle Larson and Sheri Lewis (the Church had only moved for summary judgment on this issue against these two plaintiffs). The Court of Appeals reversed, reasoning "churches and the adult church workers who assume responsibility for the spiritual well-being of children of the congregation, whether as paid clergy or as volunteers, have a special relationship with those children that gives rise to a duty to protect them from reasonably foreseeable risk of harm from those members of the congregation whom the church places in positions of responsibility and authority over them." Funkhouser v. Wilson, 89 Wash.App. 644, 660, 950 P.2d 501 (1998). We agree with the Court of Appeals that the Church and Schulz owed a duty of reasonable care, but do so on slightly different grounds.
Although we have not previously addressed the issue, we find the reasoning of the New Hampshire Supreme Court, in an analogous context, persuasive. In Marquay v. Eno, 139 N.H. 708, 662 A.2d 272 (1995), former school students who allegedly had been sexually abused by school employees filed suit against the school on theories of negligent supervision and failure to protect. None of the complaints alleged the abuse took place on school premises or during school hours. Marquay, 139 N.H. at 711, 662 A.2d 272. Nevertheless, the New Hampshire Supreme Court did not reject the existence of a duty as a matter of law. The court recognized that a principal's negligent failure to control an agent is not necessarily limited to conduct performed within the scope of employment or during work hours, so long as there is a causal connection between the plaintiffs injury and the fact of the agency relationship. Marquay, 139 N.H. at 719-21, 662 A.2d 272. The court reasoned that, under such circumstances, liability exists not because of when (or where) the injury occurs, but because "the actor has brought into contact or association with the [victim] a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct...." Marquay, 139 N.H. at 719, 662 A.2d 272 (quoting Restatement (Second) of Torts ง 302B cmt. e(D)).[11] Accordingly, employers have been found liable for criminal conduct by off duty or former employees where such conduct was consistent with a propensity of which the employer knew or should have known, and the association between the victim and the employee was occasioned *275 by the employee's job. Marquay, 139 N.H. at 719-20, 662 A.2d 272 (citing cases).
We find the rationale adopted in Marquay persuasive when analogized to the circumstances presented here. In particular, we find the conjunction of four factors present in the case before us decisive to finding the existence of a duty is not foreclosed as a matter of law: (1) the special relationship between the Church and deacon Wilson; (2) the special relationship between the Church and the plaintiffs; (3) the alleged knowledge of the risk of harm possessed by the Church; and (4) the alleged causal connection between Wilson's position in the Church and the resulting harm. Under these circumstances, we simply do not agree with the Church that its duty to take protective action was arbitrarily relieved at the church door. Where a protective special relationship exists, a principal is not free to ignore the risk posed by its agents, place such agents into association with vulnerable persons it would otherwise be required to protect, and then escape liability simply because the harm was accomplished off premises or after-hours. Under these facts, the focus is not on where or when the harm occurred, but on whether the Church or its individual officials negligently caused the harm by placing its agent into association with the plaintiffs when the risk was, or should have been, known.[12]
This approach is consistent with our cases recognizing a duty to prevent intentionally inflicted harm where the defendant is in a special relationship with either the tortfeasor or the victim, and where the defendant is or should be aware of the risk. See, e.g., LaLone v. Smith, 39 Wash.2d 167, 172, 234 P.2d 893 (1951) (employer liable for employee's criminal assault on third person "because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment"); Taggart v. State, 118 Wash.2d 195, 223-24, 822 P.2d 243 (1992) (special relationship giving rise to a duty to prevent intentional harm need not be "custodial or continuous," but arises where ability to supervise is present and necessity for such supervision is or should be known); Petersen v. State, 100 Wash.2d 421, 428-29, 671 P.2d 230 (1983) (psychiatristpatient relationship gives rise to duty to take reasonable precautions to protect all persons foreseeably endangered by mental patient's release into community). Compare Carhen v. Wackenhut Corp., 73 Wash.App. 247, 256, 868 P.2d 882 (1994) (employer liable for security guard's attempted rape if employer knew of or should have known of guard's violent propensities and nevertheless conferred position of authority and responsibility), with Peck v. Siau, 65 Wash.App. 285, 289, 292-94, 827 P.2d 1108 (1992) (school not liable for teacher's off campus sexual assault of student where it did not know, nor reasonably should have known, of the risk posed by teacher).[13]
Viewing the facts in the light most favorable to the plaintiffs, a jury could reasonably find Wilson's position in the Church was a causal factor in the resulting harm. Wilson was a prominent member of the Church, placed into positions of trust over children. *276 This position not only brought him into close connection with the children of the congregation, it allegedly inspired confidence to place the plaintiffs into his care. In addition, there is evidence that Wilson baby-sat the victims in order that their father could travel on Church business and that the Church was aware of this arrangement. Given the Church's specific and superior knowledge of the facts, a jury could reasonably find the Church knew or should have known the children of its congregation, and specifically these particular plaintiffs, were exposed to an unreasonable risk of harm at the hands of Wilson.[14]
Our decision not to foreclose the imposition of a duty as a matter of law under these facts is supported by the strong public policy in favor of protecting children against acts of sexual abuse. Current law makes it a criminal offense for certain professionals to fail to notify the proper authorities when there is reason to suspect childhood sexual abuse. See RCW 26.44.030 (medical practitioners, law enforcement personnel, school personnel, nurses, social service workers, licensed child care providers and their employees, among others, are required to report suspected child sexual abuse to the proper authorities); see also RCW 26.44.080 (failure to report is a gross misdemeanor). We note that at the time of the alleged abuse in this case, certain church officials were also required by law to report suspected abuse. See former RCW 26.44.030 (1969) (requiring any "clergyman," as defined, to report suspected child sexual abuse).[15] While the reporting requirement is permissive as to "other persons" not specifically defined, see RCW 26.44.030(3), the Legislature has made clear that the prevention of child abuse is of "the highest priority, and all instances of child abuse must be reported to the proper authorities who should diligently and expeditiously take appropriate action...." Laws of 1985, ch. 259 (legislative findings appended to RCW 26.44.030). Any person who makes a good faith report of suspected abuse is absolutely immune from civil or criminal liability arising from the reporting. RCW 26.44.060(1)(a).[16]
We, therefore, conclude the Church and Schulz owed a duty of reasonable care to affirmatively act to prevent the harm, in view of their relationship to the plaintiffs, their relationship to Wilson, and given the knowledge they allegedly possessed. Whether there was a causal connection between the harm and the fact of Wilson's position in the Church, or whether the risk of harm was or should have been reasonably foreseen at the time the harm occurred, are questions of fact to be determined by the jury.
We caution that our holding is limited. We do not suggest that a principal is an insurer against all harm occasioned by its agents simply because the work situation fortuitously provides an opportunity to *277 perpetrate the harm. Nor do we decide that knowledge of potential harm alone is sufficient to give rise to a duty to warn in all cases. We do hold that where a special protective relationship exists a principal may not turn a blind eye to a known or reasonably foreseeable risk of harm posed by its agents toward those it would otherwise be required to protect simply because the injury is arbitrarily perpetrated off premises or after-hours.[17]
Finally, we reject the Church's argument that the First Amendment or article I, section 11 of the state constitution prevent this court from imposing a duty on the Church.[18] The First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles. See, e.g., Sanders v. Casa View Baptist Church, 134 F.3d 331, 336 (5th Cir.) ("the constitutional guarantee of religious freedom cannot be construed to protect secular beliefs and behavior, even when they comprise part of an otherwise religious relationship between a minister and a member of his or her congregation. To hold otherwise would impermissibly place a religious leader in a preferred position in our society.") (second emphasis added), cert. denied, ___ U.S. ___, 119 S.Ct. 161, 142 L.Ed.2d 132 (1998).
Similarly, while art. I, ง 11 of our state constitution protects "[a]bsolute freedom of conscience in all matters of religious sentiment," that protection "shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state." Thus, the specific language of art. I, ง 11 defeats the Church's state constitutional claims.
We affirm the Court of Appeals in Funkhouser and reverse the trial court on the issue of duty.

E.R.B v. Church of God
We must decide whether the claims of E.R.B.'s parents are untimely. E.R.B.'s parents brought claims against Shaw (the alleged abuser), the Local Church, and the New Life Church of God State Offices and Parsonages. The trial court dismissed. The Court of Appeals, Division II, affirmed. E.R.B. v. Church of God, 89 Wash.App. 670, 686, 950 P.2d 29 (1998).
We reverse. We find the claims brought by E.R.B.'s parents fall within the ambit of RCW 4.16.340(1). The statute allows "any person" to bring a claim based on childhood sexual abuse. Commencement of the limitations period is not determined by reference to knowledge possessed by the parents. Rather, it is determined according to knowledge possessed by the child "victim." See RCW 4.16.340(1)(b)-(c). The fact that E.R.B.'s parents allegedly had prior knowledge of the abuse is, therefore, irrelevant to the timeliness of their claims. Under the statute, the claims of parents begin to run at the same time as the underlying claims of their child(ren).
Although this result may seem unusual, the plain language of the statute controls. Therefore, we reverse the trial court and the Court of Appeals on the timeliness of claims asserted by E.R.B.'s parents.

CONCLUSION
For the reasons stated above, the decisions of the Court of Appeals in Funkhouser v. Wilson, 89 Wash.App. 644, 950 P.2d 501, and C.J.C. v. Corporation of the Catholic Bishop, 88 Wash.App. 70, 943 P.2d 1150, are affirmed, *278 partially on different grounds; the decision of the Court of Appeals in E.R.B. v. Church of God, 89 Wash.App. 670, 950 P.2d 29, is reversed. The cases are remanded for proceedings consistent with this opinion.
ALEXANDER, SMITH, and TALMADGE, JJ., concur.
MADSEN, J. (concurring/dissenting).
While I agree with the majority, in most respects, I would hold as a matter of law that the defendants in Funkhouser v. Wilson, No. 66580-0, did not owe a duty to Sheri Lewis and Janelle Larson to control Orin Wilson, to protect Sheri and Janelle from his criminal acts, or to warn their parents that he was a child molester. I disagree with the majority's holding that defendants owed a duty of reasonable care to affirmatively act to prevent the harm that occurred as a result of a private, nonchurch-related child care arrangement between members of a church congregation. The majority fails to recognize the First Amendment implications of its decision, and it expands the special custodial relationship theory of liability past rational limits. I must respectfully dissent.

Facts
The negligence claims at issue are those of Ms. Lewis and Ms. Larson against Cavalry Baptist Church of Twisp and David Schulz, arising out of Wilson's molestation of them when they were children. Wilson held unpaid positions of leadership in the church. The acts of molestation occurred at Wilson's home when he and his wife were taking care of plaintiffs at their parents' request. The molestation of these plaintiffs did not occur on church property nor during church sponsored activities. Defendants did not recommend Wilson as a babysitter.
Plaintiffs contend that Schulz, also a church leader, learned through a telephone call in 1968 that Wilson was a child molester, but failed to warn anyone of danger posed by Wilson to children or to prevent Wilson from being involved with children through church activities. They urge that defendants had a duty to control Wilson and to protect plaintiffs from him. Defendants moved for summary judgment on the ground that they owed no duty of care as a matter of law. The trial court granted summary judgment of dismissal, ruling that as a matter of law defendants owed no duty.
The Court of Appeals reversed. That court held that defendants did not have a special relationship with Wilson giving rise to a duty to control him so as to prevent him from harming plaintiffs, but did have a duty arising out of a special relationship between defendants and Ms. Lewis and Ms. Larson. The court reasoned "that churches and the adult church workers who assume responsibility for the spiritual well-being of children of the congregation, whether as paid clergy or as volunteers, have a special relationship with those children that gives rise to a duty to protect them from reasonably foreseeable risk of harm from those members of the congregation whom the church places in positions of responsibility and authority over them." Funkhouser v. Wilson, 89 Wash. App. 644, 660, 950 P.2d 501, review granted, E.R.B. v. Church of God, 135 Wash.2d 1001, 959 P.2d 126 (1998). In light of this holding, the Court of Appeals did not reach plaintiffs' argument that a duty was owed pursuant to Restatement (Second) of Torts ง 302B (1965).
The majority affirms, but does so on rather nebulous grounds. The majority does not address plaintiffs' independent theories of special relationships and ง 302B, saying the issues are not distinctly severable. Majority at 277 n. 17. Instead, the majority says that the combination of four factors is decisive in finding duty is not foreclosed as a matter of law, i.e., a special relationship between the church and Wilson, a special relationship between the church and plaintiffs, alleged knowledge possessed by the church, and an alleged causal connection between Wilson's position in the church and resulting harm. Majority at 275. The first two of these factors are legal conclusions drawn without legal analysis. The majority also says it does not "adopt wholesale" the duty described in ง 302B. Majority at 277 n. 17. Nevertheless, the majority uses some of the theory associated with that section, again without sufficient analysis. The majority also tosses into *279 the mix language of principal and agent, without discussing the legal principles involved and without explaining how liability in this case may be found premised upon a principal-agent (or master-servant) relationship. Majority at 275. In addition to these concerns, there are very significant First Amendment issues which must be addressed in light of plaintiffs' theories.
Unfortunately, in the end, the majority's analysis is so vague that defining the limits of the duty announced is virtually impossible. The majority's lack of precision is particularly troubling given the settled common law rule that one is generally not liable for the criminal acts of third parties. Moreover, this court quite recently disapproved of this kind of intermingling of distinct theories. Niece v. Elmview Group Home, 131 Wash .2d 39, 48-49, 929 P.2d 420 (1997) (rejecting argument which combined theory of liability for negligent supervision based on special relationship between group home and resident and theory of liability for breach of duty arising out of special relationship between group home and resident; first theory does not serve to define the duty owed under second theory). Regrettably, as a result of its unclear analysis, the majority concludes that a church's duty extends to a private, nonchurch-related, off-church-premises child care arrangement between church members. The court should address the separate theories actually advanced by plaintiffs, and hold that as a matter of law no duty is owed as the trial court correctly ruled.

Analysis
When reviewing a grant of summary judgment, the appellate court makes the same inquiry as the trial court, i.e., summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Taggart v. State, 118 Wash.2d 195, 199, 822 P.2d 243 (1992); CR 56(c). The facts, and reasonable inferences from the facts, are considered in the light most favorable to the nonmoving party. Taggart, 118 Wash.2d at 199, 822 P.2d 243. Questions of law are reviewed de novo. Sherman v. State, 128 Wash.2d 164, 183, 905 P.2d 355 (1995). Existence of a duty is a question of law. Schooley v. Pinch's Deli Market, Inc., 134 Wash.2d 468, 474, 951 P.2d 749 (1998).
Plaintiffs contend the Court of Appeals erred in holding that there was no special relationship between defendants and Wilson giving rise to a duty to control Wilson, but that the Court of Appeals correctly held that a special protective relationship existed between defendants and children of the church giving rise to a duty. Plaintiffs also maintain that a duty was also owed because defendants had knowledge that Wilson was an accused child molester and knowingly installed him in a position where he could gain the trust of parents. Thus, according to plaintiffs, defendants created the framework for abuse and it does not matter that the abuse of Ms. Lewis and Ms. Larson occurred at Wilson's home.
The Court of Appeals correctly held that no special relationship existed between defendants and Wilson giving rise to a duty on defendants' part to control Wilson. Generally there is no duty to protect another from the criminal acts of third persons. Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 223, 802 P.2d 1360 (1991). A duty to control the conduct of a third party so as to prevent physical harm to another may arise; however, where a special relationship exists between the actor and the third person giving rise to such a duty, or where a special protective relationship exists between the actor and the other. Hutchins, 116 Wash.2d at 227, 802 P.2d 1360; Restatement (Second) of Torts ง 315 (1965). Relations between the actor and the third party (who causes the harm) which give rise to a duty are described in Restatement (Second) of Torts งง 316 through 319. Restatement (Second) of Torts ง 315 cmt. c. Thus, under certain specified circumstances, a parent may have a duty to control the conduct of a minor child, id. ง 316, a master may have a duty to control a servant acting outside the scope of employment, id. ง 317, a possessor of property may have a duty to control a licensee, id. ง 318, and an actor who has taken charge of a third party having dangerous propensities may have a duty to control the actions of that third party, id. ง 319.
*280 As to ง 319, this court has recognized that a special relationship giving rise to a duty to control a party with known dangerous propensities may exist where there is a "`definite, established and continuing relationship between the defendant and the third party.'" Taggart, 118 Wash.2d at 219, 822 P.2d 243 (quoting Honcoop v. State, 111 Wash.2d 182, 193, 759 P.2d 1188 (1988)). Such a duty exists, however, only where the actor has authority to control the third party's conduct. The Court of Appeals recognized this principle. Funkhouser, 89 Wash.App. at 654, 950 P.2d 501 (though stating that the authority must be legal authority). Thus, in Petersen v. State, 100 Wash.2d 421, 671 P.2d 230 (1983), a state employed psychiatrist was found to have a duty to control the conduct of a recently released state hospital psychiatric patient where the psychiatrist had treated the patient while institutionalized, knew of the patient's dangerous propensities, and had authority to seek an additional civil commitment. In Taggart v. State, supra, parole officers were found to have a duty to control parolees where the officers had the obligation and authority to guide and supervise the parolees. A duty to control should only be imposed where the actor could conceivably satisfy that duty; in other words, the authority to actually control the third party's conduct must exist.
Plaintiffs urge that under the Church Constitution and Covenant, to which both Wilson and defendant Schulz submitted, Wilson was subject to the church's "comprehensive disciplinary authority in all areas of his public and private life including matters of conscience as well as behavior." Resp'ts' Supplemental Br. at 11. In their brief to the Court of Appeals they cited that church document for its standards applicable to church members and leaders, including obligations to nurture those in their care, to live exemplary lifestyles, and to be committed to defined spiritual standards, beliefs and standards of behavior. Appellants' Br. on Appeal at 24-25. According to plaintiffs, the Church Constitution and Covenant provided defendants the authority to control Wilson, at all times and in all circumstances.
The difficulty with plaintiffs' argument is twofold. First, as the Court of Appeals noted, the church document gives authority to discipline members only where there has been a written allegation of misconduct, which did not occur in this case.
Second, plaintiffs' argument is that the religious standards held by the church and submitted to by its members give rise to authority to control Wilson, leading to a tort duty on defendants' part to control his conduct. First Amendment concerns are clearly at issue. In addressing these concerns, it is important to keep in mind that the issue addressed here is whether a special relationship existed between defendants and Wilson, for purposes of ง 315(b) of the Restatement (Second) of Torts. Plaintiffs rely upon the religious obligations defined by the Constitution and Covenants for the proposition that a special relationship does exist.
In order to decide whether defendants had authority to control Wilson, not only on church premises and during church-related activities, but also in his private life during nonchurch activities, a court would necessarily have to interpret church doctrine and religious principles set forth in the church document in order to determine whether the expansive authority asserted by plaintiffs existed under church law. Such an inquiry is forbidden under the First Amendment. See generally, e.g., Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871); Kedroff v. Saint Nicholas Cathedral, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); Serbian E. Orthodox Diocese for U.S. & Canada v. Milivojevich, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). While there is no bar to examining a church constitution in purely secular terms, a civil court may not resolve ecclesiastical questions. Jones v. Wolf, 443 U.S. 595, 604, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). The provisions relied upon by plaintiffs clearly involve spiritual standards, which are not for a civil court to determine.
The majority mistakenly concludes, however, that constitutional inquiry is not required *281 because religious organizations do not have immunity to engage in tortious conduct as determined under secular standards (which the majority apparently believes is the case here). Majority at 277.[1] However, to agree with plaintiffs' claim that the Church Constitution and Covenant defines the church's authority, and thus control, over Wilson during all facets and all times of his life would require a court to engage in constitutionally forbidden interpretation of church doctrine and religious principles.[2] Because the majority fails to identify the needed authority and control defendants could exert over Wilson, it misses the constitutional dilemma.
This court should decline to find a special relationship between defendants and Wilson giving rise to a duty on defendants' part to control Wilson during nonchurch-related activities and prevent the harm that occurred.
Plaintiffs next claim that a special protective relationship existed between defendants and the children of the congregation, giving rise to a duty to control Wilson and protect plaintiffs from him. See Restatement (Second) of Torts ง 315(a)(1965). The majority analogizes to schoolchildren placed in the custody of school. Majority at 274. In the school situation, "the protective custody of teachers is ... substituted for that of the parent." McLeod v. Grant County School Dist. No. 128, 42 Wash.2d 316, 319, 255 P.2d 360 (1953). A school accordingly has a duty to protect pupils in its custody from reasonably anticipated dangers. Id. at 319-20, 255 P.2d 360. The duty of a school to protect children in its custody falls within the broader definition of duty set forth by Restatement (Second) of Torts ง 320 (1965):
One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty of exercising reasonable care so as to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and
(b) knows or should know of the necessity and opportunity for exercising such control
(McLeod, 42 Wash.2d at 320, 255 P.2d 360 (quoting Restatement (Second) of Torts ง 320)). In the school situation, the child "is deprived of the protection of his parents or guardian. Therefore, the actor ... is properly required to give him the protection which the custody or the manner in which it is taken has deprived him." Restatement (Second) of Torts ง 320 cmt. 6.
A church which has custody of children during religious classes and services, for example, may have a special protective relationship with the child giving rise to a duty of protection during those times, as the majority indicates. However, as the majority acknowledges, this case does not involve children left in the protective custody of the church during the times when the acts of molestation occurred. Nor were any church-related activities involved. Instead, through a private arrangement between their parents and Wilson, plaintiffs were at Wilson's home when the acts occurred. Plaintiffs were not deprived of the protection of their parents; defendants were not substituted for plaintiffs' parents. To conclude under these circumstances, as the majority does, that a special custodial relationship existed between defendants and plaintiffs requiring them to protect plaintiffs from Wilson is to expand this theory of liability beyond recognition.
*282 Nor is the Court of Appeals view on this issue sound. That court reasoned, as noted earlier, "that churches and the adult church workers who assume responsibility for the spiritual well-being of children of the congregation... have a special relationship with those children" giving rise to a duty to protect the children under facts like those in this case. Funkhouser v. Wilson, 89 Wash.App. 644, 660, 950 P.2d 501, review granted, E.R.B. v. Church of God, 135 Wash.2d 1001, 959 P.2d 126 (1998). The problem with this reasoning is obvious. The Court of Appeals' determination is based upon interpretation of church doctrine and religious principles; duty is found because church members assumed spiritual responsibility for children of the congregation. Such a determination plainly runs afoul of the First Amendment. The majority correctly declines to rest its decision on this ground. Majority at 274.
Plaintiffs also argue that duty should be found based upon Restatement (Second) of Torts ง 302B (1965). Section 302B provides that "[a]n act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal." Plaintiffs urge that defendants had knowledge that Wilson was an accused child molester and knowingly installed him in a position where he could gain the trust of parents.
Initially, plaintiffs argue that knowledge of the likelihood of a criminal act, alone, gives rise to a duty to safeguard others from the risk of harm. Appellants Br. on Appeal at 16-17. The legal duty to act for the protection of others requires more than knowledge of a risk of harm:
The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.
Restatement (Second) of Torts ง 314 (1965)(emphasis added). Section 302B does not state a rule to the contrary. That section defines what constitutes a negligent act or omission where third party conduct is concerned. As the comments to the section explain, generally the actor may proceed on the basis that third persons will not act to cause harm to others, particularly where intentional criminal conduct is involved. Id. ง 302B, cmt. d However, certain situations may give rise to a duty to guard against such conduct: where a special responsibility toward the one suffering the harm gives rise to such a duty, or "where the actor's own affirmative act has created or exposed the other to a recognizable high degree of risk of harm through such misconduct, which a reasonable [person] would take into account." Id cmt. e. Plaintiffs urge that the situation in this case is described in cmt. e, para. D which states that a duty may exist "[w]here the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under such circumstances which afford a peculiar opportunity or temptation for such misconduct." Id. cmt. e, para. D.
A duty as described in cmt. e, para. D might be found in this case if, for example, defendants knew Wilson was likely to molest children, yet allowed him association with children during church activities under circumstances where a peculiar temptation or opportunity for molestation existed. However, the duty claimed here is not for such periods. Plaintiffs were not molested during any church activities or on church premises. Defendants did not bring Wilson and plaintiffs into contact or association under the circumstances when the misconduct occurred โ they did not bring Wilson and plaintiffs together at Wilson's home. There is no allegation or evidence in the record that defendants recommended Wilson or his wife as child care providers, or that they had anything to do with the child care arrangements.[3]
*283 The majority holds, nevertheless, that a duty existed. The majority finds a New Hampshire case persuasive authority for the proposition that tort liability of a principal may be found for criminal conduct of an offduty employee where the employer knew of the dangerous propensities of the employee, and the association between the victim and the employee was occasioned by the employee's job. Marquay v. Eno, 139 N.H. 708, 662 A.2d 272 (1995).[4]
However, this court has held that "exceptional circumstances" are required before imposition of the duty described in cmt. e, para. D to protect others from third party criminal conduct. Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 230, 802 P.2d 1360 (1991). Restatement (Second) of Torts, ง 302B cmt. e, para. D refers to bringing about an association between the third party causing the harm and the victim under circumstances affording a "peculiar opportunity or temptation for ... misconduct." (Emphasis added). I simply cannot agree that the voluntary association of individuals in a religious organization gives rise to a duty on the part of the church concerning private nonchurch-related child care arrangements between members of the congregation. These are not the "exceptional circumstances" envisioned by our case law nor has the church or its leaders brought about an association under the circumstances where the misconduct occurs, as envisioned by the Restatement.
Rather than limiting application of ง 302B cmt. e, para. D to "exceptional circumstances," the majority's analysis is far reaching, encompassing a variety of organizations where families associate, such as day care centers, youth groups, civic organizations, sports clubs and activities, music groups, parent-teacher associations and volunteer activities in public and private schools. Virtually any organization providing services or activities for children falls under the majority's analysis because in any such organization a parent might come to trust those involved in the activity, even those in voluntary capacities. I do not believe that an organization extending membership to families with children should become the guarantor of the other members' private conduct.[5]
Sexual abuse of children is a tragedy. Hard questions are presented because the court is faced with strong public policy favoring the protection of children from sexual abuse. At the same time, payment for that harm is sought not from the tortfeasor, but from others. Ultimately, the court is determining potential liability of a third party for another person's intentional criminal conduct. As difficult as it may be to conclude that a cause of action should not exist, there is no principled basis for finding liability on the part of defendants in this case.
I agree with the trial court and would hold that as a matter of law defendants had no duty to control Wilson or to protect plaintiffs from his criminal conduct at his home under the facts asserted by plaintiffs.
Finally, although I otherwise generally agree with the majority, I think it places too much reliance on DeYoung v. Providence Med. Ctr., 136 Wash.2d 136, 960 P.2d 919 (1998) in analyzing RCW 4.16.340. The meaning of the statute was not at issue in that the majority itself acknowledges. Majority at 267.
DURHAM, J. (dissenting).
In a misguided attempt to afford relief to the injured Plaintiffs in this case, the majority misconstrues the childhood sexual abuse statute and eviscerates statute of repose protections for religious, community and other organizations. The majority's rule tolls the statute of limitation under RCW 4.16.340 not just for suits against the abuser, but for suits against an organization that negligently failed to prevent the abuse. It further tolls the statute of limitation for claims against a *284 church brought by the parents of a victim, even if the parents were aware of the abuse at the time it occurred. The majority's approach exposes organizations to a perpetual threat of liability for negligent omissions that occurred ten, twenty or thirty years ago. Because this broad reading is contrary to the clear statutory language, I respectfully dissent.

I
Abusive relationships, by their very nature, often depend on concealment, emotional blackmail, threats, and an imbalance of power. See Note, The Discovery Rule: Allowing Adult Survivors of Childhood Sexual Abuse the Opportunity for Redress, 61 Brook. L.Rev. 199, 205-07 (1995). Even if victims recognize that they have been abused, the unique character of the relationship between the victim and the abuser may prevent victims from connecting the abuse to the resulting emotional harm within the statute of limitation. In enacting RCW 4.16.340, the Washington Legislature recognized that the abuser/victim relationship often prevents a victim from acknowledging the abuse or making a connection between the abuse and resulting injuries. See Laws of 1991, ch. 212 (finding that victims may be unable to understand or make the connection between the abuse and the emotional damage it causes).
RCW 4.16.340 extends the statute of limitation, thereby allowing victims of childhood sexual abuse to sue their abusers within three years of the discovery of an injury caused by the abuse, even if that discovery should occur decades later. It provides, in part:
(1) All claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within the later of the following periods:
(a) Within three years of the act alleged to have caused the injury or condition;
(b) Within three years of the time the victim discovered or reasonably should have discovered that the injury or condition was caused by said act; or
(c) Within three years of the time the victim discovered that the act caused the injury for which the claim is brought:
....
(5) As used in this section, "childhood sexual abuse" means any act committed by the defendant against a complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of chapter 9A.44 RCW or RCW 9.68A040 or prior laws of similar effect at the time the act was committed.
RCW 4.16.340 (emphasis added).
Recognizing both the unambiguous statutory language and the underlying rationale for the statute, the Courts of Appeals have repeatedly and consistently held that RCW 4.16.340 covers only those suits brought by the victim against an abuser. See Jamerson v. Vandiver, 85 Wash.App. 564, 934 P.2d 1199, review denied, 133 Wash.2d 1005, 943 P.2d 663 (1997); Funkhouser v. Wilson, 89 Wash.App. 644, 950 P.2d 501 (1998); E.R.B. v. Church of God, 89 Wash.App. 670, 950 P.2d 29 (1998); C.J.C v. Corporation of the Catholic Bishop, 88 Wash.App. 70, 943 P.2d 1150 (1997).
Nonetheless, the majority overturns this precedent and applies the statute to a claim brought by the parents of a victim against a religious organization that employed the abuser. To support its position, the majority argues that the phrase "based on intentional conduct" in subsection (1) was inserted by the Legislature in order to extend the statute's coverage to claims sounding in negligence. According to the majority, "based on" means that the intentional conduct serves as a "foundation" for the lawsuit. Under the majority's interpretation, a negligence claim is based on intentional conduct where the intentional conduct serves as the "gravamen" of the complaint. Majority at 267.
After concluding that the statute applies to negligence claims, the majority uses this conclusion to extend the statute's application to suits against non-abusers. Although subsection (5) defines childhood sexual abuse as "any act committed by the defendant against a complainant," the majority overlooks this language in order to "harmonize" subsection *285 (5) with subsection (1). Majority at 269. The majority argues that because negligence claims are allowed under subsection (1), the statute must apply to suits against non-abusers who negligently failed to prevent the abuse. This is true because the claims against an abuser would necessarily be grounded only on the abuser's intentional conduct. The majority thus concludes that the limitations of subsection (5) do not affect the scope of the statute. However, disregarding language in a section of a statute in order to reconcile it with the previous analysis of a different section does not "harmonize" the two sections.
In fact, it is only when all of the sections of the statute are read in conjunction that we gain a complete picture of RCW 4.16.340. When one replaces the term "childhood sexual abuse" in subsection (1) with its definition in subsection (5), the statute would read as follows: "All claims or causes of action based on intentional conduct brought by any person for recovery of damages for injury suffered as a result of "any act committed by the defendant against a complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of chapter 9A.44 RCW." RCW 4.16.340(1), RCW 4.16.340(5).
Applying the statutory definition of "childhood sexual abuse" unambiguously shows that the statute covers only suit's based on unlawful abuse perpetrated by the defendant. The plain language of the statute states that it encompasses "claims ... brought ... for injury suffered as a result of ... [a sex offense] committed by the defendant against a complainant." RCW 4.16.340(1), (5). Nothing in the statute's language indicates that it extends to suits brought against a defendant whose agent committed the unlawful acts. Similarly, the plain language of the statute precludes the inference that the statute applies to suits brought by the parents of the victim. For a cause of action to be brought under RCW 4.16.340, the defendant of the lawsuit must have abused the complainant.
Contrary to the majority's strained interpretation, the purpose of the "based on" language is to ensure that the statute of limitation will be tolled for all causes of action brought by the victim against the abuser for the abuser's intentional conduct. The Legislature recognized that a victim may bring several different types of claims against her abuser, i.e., assault, battery, intentional infliction of emotional distress). The statutory language operates to extend coverage to all of these varied claims.
Legislative history bolsters this reading. The Legislature repeatedly describes RCW 4.16.340 as tolling the statute of limitation for suits brought against the abuser. The Final Bill Report, which tallies votes and summarizes the Bill as enacted into law states that:
The statute of limitations is changed to allow victims of childhood sexual abuse an additional three years from the date of discovery of the abuse to bring an action for civil damages against the abuser for intentional sexual abuse.
Final Legislative Report, 50th Legis., Reg. Sess. 146 (Wash.1988) (emphasis added). The exact same language is used in the Senate Bill Report 6305, which states that the act tolls the statute of limitation for suits "against the abuser." Senate Comm. On Law and Justice, S.B. Rep. 6305, at 1 (emphasis added). Likewise, the House Bill Report states that:
A cause of action for intentional childhood sexual abuse must be commenced within three years....
H.B. Rep. ESSB 6305, at 2 (1988). Where a cause of action is for intentional abuse as described in the House Bill Report, the intentional abuse must serve as an element of the claim. Finally, the "Fact Sheet on Legislation" that was circulated with the bill explains:
No public benefit supports a rule that shields childhood sexual abusers from the consequences of their conduct.... The hope is that this legislation, along with providing victims of childhood sexual abuse with a remedy, will have a chilling effect on potential abusers.
"Fact Sheet on Legislation Applying the Discovery Rule to Civil Suits Brought by Adult Survivors of Childhood Sexual Abuse," S.B. Rep. 6305 (1988) (emphasis added) (prepared *286 by Jana Mohr, representing Patti Barton).
This court looks to a bill's legislative reports to determine the legislative intent. See Covell v. City of Seattle, 127 Wash.2d 874, 887, 905 P.2d 324 (1995) ("This court has sanctioned recourse to final legislative reports as an aid in determining legislative intent."); Biggs v. Vail, 119 Wash.2d 129, 134, 830 P.2d 350 (1992) (if statute ambiguous, look to extrinsic aids such as final legislative reports); Kadoranian v. Bellingham Police Dep't, 119 Wash.2d 178, 185, 829 P.2d 1061 (1992) (referring to a quotation from the Final Legislative Report as "the express legislative intent" of the act). See also Buchanan v. Simplot Feeders Ltd. Partnership, 134 Wash.2d 673, 680, 952 P.2d 610 (1998); Noble Manor Co. v. Pierce County, 133 Wash.2d 269, 277-78, 943 P.2d 1378 (1997); Brown v. City of Yakima, 116 Wash.2d 556, 562, 807 P.2d 353 (1991).
The legislative intent is clear and comports with the explicit statutory language. RCW 4.16.340(5) defines childhood sexual abuse as an act "committed by the defendant against a complainant" because the Legislature intended to limit the act's scope to suits brought by a victim against the abuser.
Despite this clear statement of intent, the majority inexplicably finds this legislative history to be "inconclusive." Majority at 269 n. 6. As support for this assertion, it points to a report by the Northwest Women's Law Center recommending that the Act apply "to civil suits alleging negligent and/or intentional torts." See "Proposed Legislation Regarding the Statute of Limitations for Civil Suits Brought by Adult Survivors of Incest or Childhood Sexual Abuse," S.B. Rep. 6305 (1988). However, an interest group's recommendation regarding how the final bill should read does not render an uncontroverted statement of legislative intent inconclusive.
Other states have interpreted similarly worded statutes as allowing only claims against the abuser. Rhode Island's statute is identical to ours in all relevant respects. It tolls the statute of limitation for "[a]ll claims or causes of action based on intentional conduct ..." and defines sexual abuse as any illegal sexual act "committed by the defendant against a complainant." R.I. Gen. Laws ง 9-1-51(a),(e) (1997). In Kelly v. Marcantonio, 678 A.2d 873, 875-76 (R.I. 1996), a woman who was abused by her father brought a negligence claim against her mother for failing to prevent the abuse. The Rhode Island Supreme Court dismissed the plaintiffs claim, limiting the application of the statute to causes of action against the perpetrator of the abuse. It held that the statute, by definition, applies only where the defendant of the tort suit committed the sex offense. Kelly, 678 A.2d at 877.
Likewise, California has held that an analogous law tolls the statute of limitation for only those claims brought against the abuser. In Debbie Reynolds Prof'l Rehearsal Studios v. Superior Court, 25 Cal.App.4th 222, 30 Cal.Rptr.2d 514, 30 Cal.Rptr.2d 514 (1994), the court held that the California Civil Proceeding Code's definition of childhood sexual abuse as "any act committed by a defendant against a plaintiff clearly limits application of the statute to suits brought by the victim against her abuser. Reynolds, 25 Cal. App.4th at 231, 30 Cal.Rptr.2d 514.
The majority declines to adopt the reasoning of these courts and instead follows the analysis of the Montana Supreme Court. In Werre v. David 275 Mont. 376, 913 P.2d 625 (1996), the Montana Supreme Court allowed a negligence claim against the employer of an abuser to be brought under Montana's statute tolling the limitation period for claims relating to childhood sexual abuse. However, Montana should not serve as a role model for this court's interpretation of RCW 4.16.340 because the Montana law defines childhood sexual abuse differently. Montana's statute defines childhood sexual abuse as "any act committed against a plaintiff." Mont.Code Ann, ง 27-2-216(3) (1997). In contrast, the Rhode Island and California cases are instructive because, like Washington, Rhode Island and California define childhood sexual abuse as any act committed by the defendant against the complainant. The very language that is dispositive in determining the scope of RCW 4.16.340 is missing from the Montana statute.
RCW 4.16.340 allows victims of abuse to sue their abusers within three years of the discovery of the injury, even if that discovery *287 is made decades after the illegal acts occurred. The statute's tolling provision is expansive, but is warranted given the unique nature of the abuser/victim relationship, and the emotional trauma the abuse inflicts. However, the Legislature never intended to extend the statute to claims brought by the parents of the victim against an organization for its negligent failure to prevent the abuse. Incorporating the statutory definition of childhood sexual abuse into subsection (1) shows that the statute applies only to "claims... brought ... for injury suffered as a result of ... [a sex offense] committed by the defendant against a complainant." RCW 4.16.340(1), (5). Legislative history supports this plain language by specifying that the act tolls the statute of limitation in suits "against the abuser." This reading is also consistent with other states' interpretation of analogous statutory language. The majority's decision to apply the tolling provisions of RCW 4.16.340 to suits against non-abusers cannot be reconciled with the Legislature's unequivocal mandate.

II
Given the fact that RCW 4.16.340 does not toll the statute of limitation, the court must determine whether the common law discovery rule applies to toll the statute of limitation and allow the Plaintiffs' claims. I believe that the discovery rule does not apply. Accordingly, the Plaintiffs' claims are time barred.
Generally, in suits for negligent injury, the cause of action accrues at the time the act or omission occurs. In re Estates of Hibbard, 118 Wash.2d 737, 744-45, 826 P.2d 690 (1992). This rule reflects a balancing of the remedial goals of the justice system with the "recognition that compelling one to answer a stale claim is in itself a substantial wrong." Id. at 745, 826 P.2d 690. However, where a plaintiff lacks the means or ability to ascertain that a wrong has been committed, Washington courts have created an exception known as the common law discovery rule. Metropolitan Servs., Inc. v. City of Spokane, 32 Wash.App. 714, 721, 649 P.2d 642, review denied, 98 Wash.2d 1008 (1982). The discovery rule tolls the statute of limitation until the time the plaintiff knew, or in the exercise of due diligence should have known, of the injury that the negligence has caused. Hibbard, 118 Wash.2d at 752, 826 P.2d 690. Because the rule compels a defendant to answer stale claims, this court has applied it only in limited circumstances in which the plaintiff lacked the means to ascertain that a wrong had been committed. This court has previously applied the rule in cases of professional malpractice, occupational diseases and fraudulent concealment. Bowles v. Department of Retirement Sys., 121 Wash.2d 52, 80, 847 P.2d 440 (1993).
Whether or not to extend the discovery rule to the circumstances of any case is fundamentally a "judicial policy determination." Gazija v. Nicholas Jerns Co., 86 Wash.2d 215, 221, 543 P.2d 338 (1975). This court decided in Tyson v. Tyson, 107 Wash.2d 72, 727 P.2d 226 (1986) that the injustice of forcing defendants to face stale claims outweighed the plaintiffs' right to have the statute of limitation tolled until discovery of the injury. Tyson rejected the application of the common law discovery rule in childhood sexual abuse cases, stating that:
If we applied the discovery rule to such actions, the statute of limitations would be effectively eliminated and its purpose ignored. A person would have an unlimited time to bring an action, while the facts became increasingly difficult to determine. The potential for spurious claims would be great and the probability of the court's determining the truth would be unreasonably low.
107 Wash.2d at 79, 727 P.2d 226. Tyson thus mandated that claims by victims of sexual assault must be brought within the applicable statute of limitation.
RCW 4.16.340 specifically overruled Tyson regarding suits between a victim and an abuser by tolling the statute of limitation until the victim discovers an injury, regardless of when the abuse occurred. As explained above, RCW 4.16.340 does not encompass negligence claims brought by the parents of a victim against the abuser's employer. We must assume by this exclusion that the Legislature intended to change the statute of limitation only as it applies to *288 claims brought for intentional sexual abuse. See, e.g., State ex rel. Port of Seattle v. Department of Pub. Serv., 1 Wash.2d 102, 112, 95 P.2d 1007 (1939) ("expressio unius est esclusio alterius"โthe mention of one thing implies the exclusion of another thing). See also State v. Williams, 94 Wash.2d 531, 537, 617 P.2d 1012 (1980) (when a statute specifically designates the things or classes of things upon which it operates, it is inferred that the Legislature intended to exclude any omitted matters). Now the Plaintiffs ask this court, as a matter of judicial policy, to augment the scope of RCW 4.16.340 by extending the common law discovery rule to negligence suits against the abuser's employer.
Given the Legislature's decision not to extend the statute of limitation for negligence suits, there is no justification for this court to independently adopt what the Legislature has rejected. "[I]t is in areas of legislative inactivity that the judiciary may safely perform a creative role." Burkhart v. Harrod, 110 Wash.2d 381, 389, 755 P.2d 759 (1988) (quoting Cornelius J. Peck, Comments on Judicial Creativity, 69 Iowa L.Rev. 1, 9 (1983-84)). In Burkhart, the plaintiff asked this court to adopt a rule of social host liability. We declined to do so, explaining that the Legislature had already acted in the area by imposing penalties on those who sell alcohol to intoxicated persons. The Legislature did not impose similar penalties on those who give alcohol away, and this distinction implied that the Legislature intended to treat commercial hosts differently than social hosts. Burkhart, 110 Wash.2d at 388, 755 P.2d 759. Because the Legislature is in a superior position to weigh competing societal interests, we should defer when the Legislature takes a constructive role in shaping tort law. Burkhart, 110 Wash.2d at 385, 755 P.2d 759.
In regard to the statute of limitation in childhood sexual abuse cases, the Legislature has evinced its commitment to shaping policy by enacting RCW 4.16.340 and repeatedly amending it to define its scope. See Laws of 1989, ch. 317 ง 1 (clarifying the accrual provision for a person under the age of 18); Laws of 1991, ch. 212, ง 1 (explaining that the discovery of less serious injuries does not commence the period of limitations). This court should not intrude on the Legislature's decision to extend the statute of limitation in suits against the abuser, but not in suits against negligent entities. To act where the Legislature has chosen not to act by applying the discovery rule to negligence suits would usurp legislative policy decisions through judicial activism.
Even without the Legislature's actions in this area, extending the common law discovery rule to the Plaintiffs' claims would be unwise. The harm caused by indefinitely extending the statute of limitation for suits against organizations that negligently fail to prevent abuse outweighs the harm to the individual plaintiff who may be precluded from bringing a claim. Without the discovery rule, a plaintiff must bring a negligence claim within three years of the sexual abuse, or within three years of the plaintiffs 18th birthday. If a plaintiff exceeds this time, a claim against the organization will be lost. However, a plaintiff will retain a cause of action against an abuser under RCW 4.16.340.
Any harm to a plaintiff who loses a cause of action by failing to bring it within the statute of limitation is outweighed by the harm to the defendants faced with stale claims. Defendants' ability to present a meaningful defense is compromised over time. Important evidence may be lost or forgotten. In intentional tort cases against an abuser, the issue at trial will be whether the abuse occurred. Testimony of the victim and family members regarding this traumatic event will play a crucial role in determining the facts. In contrast, negligence suits against an organization rest on who in management knew about the abuser's propensity, when they knew it, and what they could reasonably have done to prevent the abuse from occurring. Evidence (testimonial or documentary) of the mental state of the managers of an organization is particularly susceptible to loss and mistake with the passage of time. Accordingly, requiring defendants to answer allegations of negligence so long after it occurred may limit their opportunity to produce exculpatory evidence. For example, just in the cases before us, at least *289 one witness has died, Diocese files are missing and several other witnesses' memories have faded.
Furthermore, allowing stale claims against religious and community groups would have serious social repercussions. Employers and other organizations will face a perpetual threat of liability for negligent omissions that occurred decades earlier. Churches, synagogues, boy and girl scouts, youth sports leagues, and other groups will all be hindered in their financial planning and insurance decisions for the future, because they will never be free from the threat of suit.
Extending the common law discovery rule to these cases would result in profound unfairness to the defendants. This court should be loathe to impinge on the legislative decision to extend the statute of limitation only in claims brought by a victim against her abuser. This is true especially in light of the negative societal impact of applying the common law discovery rule to negligence claims against organizations that fail to prevent abuse.

CONCLUSION
Contrary to the majority, the childhood sexual abuse statute does not provide the Plaintiffs in this case with a means to end run the statute of limitation. By its plain language, RCW 4.16.340 does not apply to claims brought against the employer of the abuser. Further, in light of both Washington case law and RCW 4.16.340, we should decline to extend the common law discovery rule to childhood sexual abuse Suits alleging negligence. The majority's holding not only undermines the Legislature's efforts to shape the law in this area, but also exposes religious and community groups to liability and accusations against which they will have no meaningful opportunity to defend. Because I believe the Plaintiffs' claims against the churches were time barred under the statute of limitation, I respectfully dissent.[1]
GUY, C.J., and DOLLIVER, J.P.T., concur.
SANDERS, J. (concurring in dissents).
I concur in Justice Durham's dissent on the statute of limitation issue and concur in Justice Madsen's dissent on the merits.
NOTES
[1] As a result, we do not reach plaintiffs' alternative theory that claims were timely filed under the common law discovery rule.
[2] The facts are described in the light most favorable to plaintiffs whose claims were dismissed on summary judgment. For a more detailed recounting of the facts in each case, see Funkhouser v. Wilson, 89 Wash.App. 644, 950 P.2d 501 (1998); E.R.B. v. Church of God, 89 Wash.App. 670, 950 P.2d 29 (1998); C.J.C. v. Corporation of the Catholic Bishop, 88 Wash.App. 70, 943 P.2d 1150 (1997).
[3] Divisions I and II of the Court of Appeals split on the applicability of the common law discovery rule. In C.J.C. and Funkhouser, Division I applied the discovery rule and reversed summary judgment; under similar facts, Division II in E.R.B. refused to apply the discovery rule and affirmed summary judgment. Compare C.J.C, 88 Wash.App. 70, 943 P.2d 1150, and Funkhouser, 89 Wash.App. at 669, 950 P.2d 501, with E.R.B., 89 Wash.App. at 683-84, 950 P.2d 29. Because we find the claims against nonabusers and church entities fall under RCW 4.16.340, we do not decide whether the common law discovery rule would otherwise apply.
[4] In Tyson v. Tyson, 107 Wash.2d 72, 79, 727 P.2d 226 (1986), this court, in a plurality decision, held the discovery rule did not apply to intentional tort claims where the plaintiff has suppressed the memory of the abuse during the period of the statute of limitations. RCW 4.16.340 was enacted in 1988 in response to our decision in Tyson. Laws of 1988, ch. 144, ง 1.
[5] In addition to conforming to the language of the statute, our interpretation is entirely consistent with traditional tort principles. See, e.g., McLeod v. Grant County Sch. Dist. No. 128, 42 Wash.2d 316, 321, 255 P.2d 360 (1953) ("[b]ut intervening criminal acts may be found to be foreseeable, and if so found, actionable negligence may be predicated thereon").
[6] Legislative history which purportedly shows the statute was intended to apply only to actions against the abusers themselves is inconclusive. The Senate Bill Report states, in summary, that the new legislation would allow "an action against the abuser...." Senate Comm. on Law & Justice, S.B. Rep. 6305, at 1 (Jan. 19, 1988). The House Bill Report summarizes, by stating, a "cause of action for intentional childhood sexual abuse" must be commenced within the time allowed by the discovery rule. H.B. Rep. E.S.S.B. 6305 at 2 (Mar. 3, 1988). The legislative history also contains a report by the Northwest Women's Law Center, a major proponent of the act, which states, the purpose of the legislation is to apply the discovery rule "to civil suits alleging negligent and/or intentional torts...." See "Proposed Legislation Regarding the Statute of Limitations for Civil Suits Brought by Adult Survivors of Incest or Childhood Sexual Abuse," S.B. Rep. 6305, at 1 (1988). Finally, the "Summary of Legislation Regarding the Statute of Limitations in Civil Childhood Sexual Abuse Cases," S.B. Rep. 6305 (1988) (prepared by Jana Mohr, representing Patti Barton), states, the "proposed legislation will apply the discovery rule to civil actions based on intentional torts ... for injuries suffered as a result of that abuse." The language in these brief summaries is in sharp contrast to the adopted statutory language which allows "[a]ll claims or causes of action based on intentional conduct...." RCW 4.16.340(1).

We also reject defendants' argument regarding the effect of the words "or omission" stricken from ง 1 of the original act (requiring the claim be brought within three years of "the act (or omission) alleged to have caused the injury," (now ง (1)(a)). First, this section does not control the scope of the statute. It is, therefore, irrelevant to determining whether the statute encompasses negligence claims "based on" intentional conduct. Furthermore, the section ties the running of the limitations period exclusively to the actual commission of the intentional abuse, without reference to any omissions that may have facilitated such abuse. Thus, inclusion of the word "omission" was grammatically and logically incorrect. Accordingly, the deletion of these words has no impact on our analysis.
[7] Former RCW 9A.44.110 (repealed by Laws of 1984, ch. 262 and recodified at RCW 9.68A.090), was formerly codified at RCW 9A.88.020. The language of the two statutes is identical; both statutes were enacted by the same source. Laws of 1975, 1st Ex.Sess., ch. 260. Thus, although later moved to a different part of the criminal code, the two statutes are one and the same. Schimmelpfennig, therefore, controls.
[8] Notwithstanding Fagalde, the Court of Appeals determined that the privilege applied in part. C.J.C, No. 37632-2-I, slip op. at 22. C.J.C. does not cross-appeal that holding. Accordingly, our discussion is limited to the scope of the privilege and not whether it should have been applied in the first place.
[9] Father Calhoun's mental health counselor held a masters of education and was not a licensed psychologist. The Court of Appeals applied RCW 18.19.180, the client-counselor statute, to find a privilege. C.J.C., No. 37632-2-I, slip op. at 22. C.J.C. does not appeal this ruling. Thus, for purposes of this review we assume, without deciding, that RCW 18.19.180 provides a privilege coextensive with that of the client-psychologist privilege.
[10] The fact that both Schulz and Wilson were volunteers does not impact our analysis. A charitable entity may be held liable for the negligence of volunteers acting in an agency capacity. Abel v. Firs Bible & Missionary Conf., 57 Wash.2d 853, 855, 360 P.2d 356 (1961). Furthermore, one who assumes to act, even though gratuitously, may be held liable for his or her negligence in carrying out the act. See Roth v. Kay, 35 Wash. App. 1, 4, 664 P.2d 1299 (1983). See also Curran v. City of Marysville, 53 Wash.App. 358, 365, 766 P.2d 1141 (1989) (one who voluntarily assumes responsibility for the care of a child has a duty to exercise reasonable care to protect that child).
[11] Restatement (Second) of Torts ง 302B recognizes liability where a special protective relationship exists, or " [w]here the actor has brought into contact or association with the [victim] a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct." Restatement (Second) of Torts ง 302B cmt. e(D) (1965).
[12] The concurrence/dissent accuses the majority of "toss[ing] into the mix" principal and agent language without discussing the legal principles involved. Concurrence/dissent at 279. First, the defendants do not argue an agency relationship did not exist, only that their duty of control did not extend into Wilson's private affairs. Furthermore, under the Restatement of Torts ง 302B, an agency relationship is not required in order to establish a duty of care. Finally, under our own precedent, a duty of control or protection also does not depend on a showing of agency. Taggart v. State, 118 Wash.2d 195, 223-24, 822 P.2d 243 (1992) (duty to control does not require agency relationship but arises where ability to control is present); Nivens, 133 Wash.2d at 205, 943 P.2d 286 (duty to protect adult store patrons against reasonably foreseeable harm does not depend on agency relationship with tortfeasor). We use the words "principal" and "agent" in the present context both for simplicity and because we limit liability to harm proximately resulting from the fact of Wilson's position in the Church.
[13] Hutchins v. 1001 Fourth Ave. Assocs., 116 Wash.2d 217, 802 P.2d 1360 (1991), upon which the concurrence/dissent relies, is simply not on point. In Hutchins, no special relationship existed. We stated, in the absence of a special relationship, a duty would nevertheless attach if the defendant had brought about an "especial temptation and opportunity for criminal misconduct." Hutchins, 116 Wash.2d at 230, 802 P.2d 1360. In short, Hutchins dealt with landowner liability where no special relationships existed. It is not at all relevant to this case.
[14] The Church's argument that it could not, without written complaint, take disciplinary action against Wilson and, therefore, was under no duty to control him, is unpersuasive. The Court of Appeals reasoning is flawed, as well. See Funkhouser, 89 Wash.App. at 657, 950 P.2d 501 (declining to impose liability under a duty to control because the Church constitution and bylaws required complaints be in writing before disciplinary action could be taken). Importantly, the Church had prior warning of Wilson's alleged propensity to molest children. The Church, therefore, was in a position to refrain from developing a special relationship with Wilson and from placing him in positions of trust within the Church in the first place.
[15] In 1975, the requirement as to clergymen was repealed. Laws of 1975, 1st Ex.Sess., ch. 217, ง 3. Nevertheless, the reporting requirement continues to apply to those church officials who are engaged in "encouraging or promoting the health, welfare, support or education of children, or providing social services to adults or families, whether in an individual capacity, or as an employee or agent of any public or private organization or institution." State v. Motherwell, 114 Wash.2d 353, 357, 788 P.2d 1066 (1990) (citing former RCW 26.44.020(8)). Thus, the newly implied exemption is triggered only when the official is actually acting in the capacity of a regularly licensed or ordained minister, priest, or rabbi. Motherwell, 114 Wash.2d at 359, 788 P.2d 1066.
[16] We need not determine whether the Church specifically violated the statute. We find merely that the statute reflects a strong public policy in favor of protecting children against reasonably suspected sexual abuse through report to the proper persons. See, e.g., Bernethy v. Walt Failor's, Inc., 97 Wash.2d 929, 932-33, 653 P.2d 280 (1982) (where duty is based on common law principles, an analogous statute, even when not specifically violated, reflects strong public policy in favor of imposing a duty).
[17] Accordingly, we do not find the issue of duty in this case distinctly separable into either one of "control" or "protection," since elements of both are present. Nor need we adopt wholesale the duty described in ง 302B of the Restatement (Second) of Torts (1965).
[18] Plaintiffs' (C.J.C.'s and Funkhouser's) motion to strike the supplemental brief of the Corporation of the Catholic Bishop of Yakima (Diocese) is granted. The Diocese is a defendant in the C.J.C. case. Its brief addresses the First Amendment rights of the defendants in the Funkhouser case. The Diocese admits it did not preserve these issues in its own case. RAP 10.1(g) is intended to facilitate shared briefing related to shared issues. The rule does not allow what essentially amounts to amicus argument relating to another party's case on an issue not shared in common.
[1] The issue is not one of immunity. It is a matter of the constitutional right to religious freedom.
[2] This case is unlike some cases where claims of negligent hiring, retention and supervision of ministers, priests and the like have been allowed. First, the record does not indicate that an employment-like situation existed in this case at all. Second, while some courts hold that such claims may be allowed if questions of church law and policy need not be determined, e.g., Isely v. Capuchin Province, 880 F.Supp. 1138, 1151 (E.D.Mich.1995) (negligent supervision claim), here the church document must be interpreted in order to glean directives for personal conduct based upon religious principles and doctrine.
[3] This case is thus unlike Golden Spread Council, Inc. v. Akins, 926 S.W.2d 287 (Tex. 1996), where the court held that under cmt. e, para. D, the Golden Spread Council of the Boy Scouts of America had a duty not to recommend an individual as a scoutmaster if the council knew or should have known that the individual was peculiarly likely to molest boys. Because defendants in this case made no comparable recommendation, reliance upon that case by plaintiffs and the Court of Appeals is misplaced.
[4] The majority's reliance on Marquay v. Eno, 139 N.H. 708, 662 A.2d 272 (1995) is misplaced since liability there concerned an employer-employee relationship, while here the majority never adequately addresses the relationship between defendants and Wilson.
[5] This is of particular concern in the case of religious organizations, many of which welcome all, even the flawed.
[1] I dissent only as to the application of RCW 4.16.340 and the common law discovery rule to negligence claims against non-perpetrators. Although I would not reach the issue, I agree with the majority's analysis regarding the existence of a duty in Funkhouser v. Wilson.