6 So.3d 662 (2009)
SPECIAL OLYMPICS FLORIDA, INC., Appellant/Cross-Appellee,
v.
Margaret SHOWALTER, et al., Appellees/Cross-Appellants.
Nos. 5D07-2104, 5D07-2332.
District Court of Appeal of Florida, Fifth District.
March 13, 2009.
Rehearing Denied April 14, 2009.
*663 Elliot H. Scherker and Brigid F. Cech Samole of Greenberg Traurig, P.A., Miami, for Appellant.
Jamie Billotte Moses of Fisher, Rushmer, Werrenrath, Dickson, Talley & Dunlap, P.A., Orlando, for Appellees.
PER CURIAM.
The central question in this case is whether Appellant may be found liable for the acts of one of its volunteers who molested Appellees, two developmentally disabled adults, in a bowling center parking lot. Although we reverse the judgment and instruct the trial court to direct a verdict as to two counts, we remand for a new trial on the negligence count.
Appellant is a nonprofit organization that "[p]rovide[s] sports training and competition for persons with ... disabilities, [and] ongoing opportunities to participate with their families and the community." Appellant sponsors between 11 and 13 competitions per year in Florida. All of Appellant's activities are run by county coordinators, who are volunteers, as are the coaches and others who assist in operating the programs. Appellant has approximately 34 paid staff members throughout Florida and as many as 17,000 volunteers. Appellees, Margaret Showalter and Nancy Vasil, are both developmentally disabled adults who participate as athletes in Appellant's events. Ms. Showalter is apparently somewhat self-reliant, although a social worker resides with her. Ms. Vasil lives with her father, who is her guardian.
One of Appellant's organized activities, in which Appellees participate, is an annual bowling competition. The athletes practice between August and November each year and then participate in county, regional and state competitions. Appellant arranged with Colonial Lanes, a public bowling center in Orange County, to conduct much of its bowling activity there. Practices were scheduled to begin every Saturday at 1:30 p.m. and the athletes were instructed to arrive no earlier than 1:00 p.m. However, the athletes widely ignored this instruction. As a consequence, volunteers routinely arrived at practices early because they anticipated that the athletes would arrive early and need supervision.
*664 On October 25, 2003, the day of the molestations, bowling practice was scheduled for 1:30 p.m. On the same day and at the same facility, Appellant also scheduled physicals for some of the athletes, beginning at 10:00 a.m. Appellant had announced the physicals at a prior event via loudspeaker. Appellees knew they were not scheduled for physicals, but they both arrived early to socialize before practice. Ms. Showalter travelled to the bowling center using public transportation. Ms. Vasil's father dropped her off at the bowling alley at 10:00 a.m. Although Ms. Vasil's father was aware that practice started at 1:30 p.m., he assumed, based on past experience, that someone from Special Olympics would be there to supervise.
Another early arriver to the October 25 practice was the accused molester, 79year-old James McDonald, who had been involved with Appellant for many years in several capacities. As his son was an athlete, Mr. McDonald participated in events as a parent. He was also a registered volunteer. In this capacity, he had been head bowling coach from the 1980s until 1994, at which time he stepped down as head coach due to accusations that he had molested another athlete and her sister. The incidents were investigated by the police, but the charges were dropped two years later. Although Appellant disputes that Mr. McDonald continued to serve in a volunteer capacity after 1994, the evidence taken in the light most favorable to Appellees suggests to the contrary.
Evidence was presented that Mr. McDonald's volunteer application remained on file until after the molestations involved in this case. According to Appellant's routine practice, this suggested that Mr. McDonald's volunteer status had not been terminated. He continued to attend practices and events regularly, even arriving early to help all the athletes, not just his son. Louise Newton, the successor bowling coach, admitted that Mr. McDonald was still there every week acting like he was in charge. As she stated: "I guess it was hard [for Mr. McDonald] to let go." After the instant molestations, Appellant sent a letter to Mr. McDonald banning him from attendance at events, but stating that "there will be an investigation and [Appellant] shall either reinstate your volunteer duties and opportunities or we shall have to determine an appropriate course of action... depending on the outcome of the investigation." Mr. McDonald apparently heeded the directive as he did not attend any of Appellant's events up to the date of trial in 2007.
In addition to the accusations that Mr. McDonald had previously molested an athlete and her sister in 1994, other allegations against Mr. McDonald were brought to Appellant's attention prior to October 25, 2003. Between 1994 and 2003, one of the Appellees reported to Ms. Newton that Mr. McDonald had molested her on more than one occasion, albeit not in connection with any of Appellant's events. During this same time period, Ms. Newton was also informed that Mr. McDonald attended dances conducted for developmentally disabled adults (not associated with Appellant's activities) where he escorted attendees to and from his van. Ms. Newton discussed these issues with Mr. McDonald but accepted his denial of claims of wrongdoing. She did, however, caution him to avoid taking developmentally disadvantaged people to his van because it appeared inappropriate. At some point in the year 2000 or 2001, Ms. Newton began keeping a "closer eye" on Mr. McDonald and had a discussion with Charlotte Day, Appellant's county coordinator, about whether he was a liability. Ms. Newton did not, however, warn anyone else associated with Appellant or the athletes' parents *665 or guardians about any suspicions concerning Mr. McDonald.
Other than to accept Mr. McDonald's resignation as head bowling coach, Appellant did nothing to limit his involvement with its activities. In fact, most people within Appellant's organization gave no apparent credit to the accusations against Mr. McDonald. For example, the county coordinator in 1994, Jane Fournier, did nothing to investigate the 1994 incident, assuming that because prosecutors dropped the charges two years later, Mr. McDonald was cleared of wrongdoing. When Charlotte Day took over as county coordinator in 1998, Ms. Fournier told her that the 1994 incident had been unfounded. Consequently, Ms. Day did not investigate the charges in any way. The county co-coordinator, Patricia Webb, although aware of many of the allegations against Mr. McDonald, concluded that he was "completely harmless."
On the day of the instant molestations, Ms. Webb arrived at the bowling center shortly after 10 a.m. to assist a volunteer physician with performing the physicals. Meanwhile, Mr. McDonald lured Appellees outside to his van where he subsequently molested them, one after the other, either in or near his van. At some point in time, Ms. Webb looked out the window into the parking lot and saw Mr. McDonald molesting one of the Appellees. While she was summoning police to report the incident, Mr. McDonald molested the other Appellee. He was subsequently arrested, and his culpability is not herein disputed.
Appellees' theory of liability was threefold. In their first count, Appellees asserted that Appellant was under a duty to protect them or control Mr. McDonald, or both, so as to prevent the foreseeable conduct of Mr. McDonald, and Appellant's failure to do so amounted to negligence. In their second count, Appellees asserted that Appellant was liable on a statutory theory. Finally, in their third count, Appellees sought to impose liability on Appellant under an agency theory. The jury returned a verdict for each Appellee on all three counts. Appellant contends that it was entitled to a directed verdict on all three counts. We agree as to the second and third counts, but disagree as to the negligence count. For the sake of clarity, we address each count in reverse order.
The third count, although labeled "Direct Liability," in substance seeks to impose vicarious liability under an agency theory for the negligence or intentional wrongdoing of Mr. McDonald. Under either theory of liability, liability must be imputed to Appellant by showing that Mr. McDonald was an agent of Appellant and was acting within the scope of his status as agent when he committed the wrong. Appellant argues that neither was established sufficiently to create a jury issue. We disagree in part. We think the evidence of agency was sufficient to be resolved by the jury. Although Mr. McDonald had resigned as head coach, there was more than ample evidence that he remained a volunteer. He remained registered as such and, more important perhaps, he continued to act as such with Appellant's acquiescence.
We agree with Appellant, however, that Mr. McDonald was not acting within the scope of his agency at the time of the incidents, notwithstanding the jury's determination to the contrary. "Generally, sexual assaults and batteries by employees are held to be outside the scope of an employee's employment and, therefore, insufficient to impose vicarious liability on the employer." Nazareth v. Herndon Ambulance Serv., Inc., 467 So.2d 1076, 1078 (Fla. 5th DCA 1985). Unless it can be established that the abuse occurred in furtherance of the employer's business, this type of conduct is not within the scope of *666 employment.[1]Agriturf Mgmt., Inc. v. Roe, 656 So.2d 954 (Fla. 2d DCA 1995) (finding abuse occurring on Agriturf's property during time perpetrator closing business not within scope of employment because sexual abuse not in furtherance of employer's business objectives); see Mason v. Fla. Sheriffs' Self-Ins. Fund, 699 So.2d 268 (Fla. 5th DCA 1997) (holding sexual assault by officer not within scope of employment, even though officer on duty, in uniform and serving warrant on woman he raped).
The second count is based on purported statutory liability under section 393.13(3)(g), Florida Statutes (2004). The parties devote considerable argument to whether a violation of the statute is negligence per se, which is how the jury was instructed. We need not address this issue because we conclude that there was no statutory violation by Appellant. If at all, the statute only imposes civil liability on the one who harms the victim and perhaps those who are vicariously liable for that person's actions.[2] Here, Appellant is not the abuser. Further, as previously discussed, Mr. McDonald was not acting within the scope of his agency with Appellant. Thus, Appellant is not vicariously liable for Mr. McDonald's conduct.
Our conclusion on the agency issue does not resolve the first count, however, which Appellees label "NEGLIGENCE." Although not a model of clarity, this count seeks to impose direct liability against Appellant because Appellant either had a duty to protect Appellees or had a duty to control Mr. McDonald, or both, and failed in that duty with resulting harm. This theory of liability is not dependent on a finding that the abuser's conduct fell within the scope of the agency or, for that matter, that the abuser was an agent. Instead, liability turns on whether there existed a "special relationship" giving rise to a duty to control or protect or both.
According to the Restatement (Second) of Torts:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
(b) a special relation exists between the actor and the other which gives to the other a right to protection.
Restatement (Second) of Torts § 315 (1965) (emphasis supplied). Comment c. of the restatement states:
The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320.
Of the enumerated sections, the one relevant here is section 320 which provides as follows:
One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely *667 to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor
(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and
(b) knows or should know of the necessity and opportunity for exercising such control.
Restatement (Second) of Torts § 320 (1965) (emphasis supplied). Appellant concedes that it had a special relationship with Appellees during scheduled activities.[3] It contends, however, that the relationship was not in effect at the time of the molestation because Appellees were at the bowling center for social reasons and were not under Appellant's "voluntary custody." Appellees counter that this issue is a question of fact in this case. We agree with Appellees.
The record is replete with evidence that, despite any contrary instruction, athletes routinely arrived early, to the point that volunteers undertook the responsibility to themselves arrive early so they could supervise the athletes. Appellant was conducting an activity at the time of the incident and the evidence is not clear that the coach's general instruction that the athletes should not show up early was intended to apply when other Appellant-sponsored activities were ongoing. There is also no evidence that any instruction was given to Ms. Showalter's social worker or Ms. Vasil's father concerning early arrival, despite the fact that this practice was apparently commonplace. The jury could have concluded that any attempt to restrict the temporal scope of Appellant's duty should have been communicated to someone with the maturity to control Appellees' behavior. The evidence also reflects that Appellant attempted to control Mr. McDonald by counseling him about the propriety of escorting developmentally disabled people to his van. The jury could have inferred from this evidence that Appellant was aware of its ability and duty to control Mr. McDonald.
Although Appellees' negligence claims are legally viable, a new trial is necessary in this case because the jury was not correctly instructed on the law. The jury was given no guidance about the nature and scope of Appellant's purported duty and was improperly advised that, by statute, the Appellees were guaranteed "the right to be free from harm" and that a violation of this statute constituted negligence.
We affirm as to the "empty chair" argument and the cross-appeal without discussion. Appellant's point regarding expert testimony is moot because we have disposed of the statutory claim. Because we are reversing the judgment for damages, we also reverse the attorney's fees award.
REVERSED AND REMANDED.
LAWSON and EVANDER, JJ., concur.
TORPY, J., concurs and concurs specially, with opinion.
TORPY, J., concurring specially.
I do not think that Appellant's duty was limited to the period during which it had actual custody of Appellees. In my view, the existence of the special relationship with both Appellees and Mr. McDonald triggered some ongoing duty to control *668 Mr. McDonald by, at a minimum, expelling him from Appellant's activities as a parent or volunteer. To merely lecture him about the propriety of taking athletes to his van hardly discharges the duty to control. I also think Appellant had a duty to warn parents or guardians of this particular danger before the athletes were exposed to the danger.
I think this is a case for the application of Restatement (Second) of Torts section 302B (1965), which provides:
An act or an omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.
One of the comments to this section states that it applies:
Where the actor has brought into contact or association with the other a person whom the actor knows or should know to be peculiarly likely to commit intentional misconduct, under circumstances which afford a peculiar opportunity or temptation for such misconduct.
Restatement (Second) of Torts § 302B cmt. e.D. Under this theory, it makes no difference whether the incident occurred while the victims were in Appellant's actual custody.
I am persuaded by the decision of the Supreme Court of Washington in C.J.C. v. Corporation of Catholic Bishop of Yakima, 138 Wash.2d 699, 985 P.2d 262 (1999), and would adopt its holding. There, under analogous facts, the court imposed liability on a church after its deacon had molested a child of the congregation because of:
(1) the special relationship between the Church and [the] deacon ...; (2) the special relationship between the Church and the plaintiffs; (3) the alleged knowledge of the risk of harm possessed by the Church; and (4) the alleged causal connection between [the deacon's] position in the Church and the resulting harm.
Id. at 275.
NOTES
[1] Appellees' counsel commendably conceded at oral argument that these assaults did not occur within the scope of the agency.
[2] Because the judge charged the jury that a violation of the statute is negligence, it is impossible to tell whether the verdict for Appellees on the negligence count was premised on a violation of the statute or a violation of the common law duty.
[3] See Hinckley v. Palm Beach County Bd. of County Comm'rs, 801 So.2d 193, 195 (Fla. 4th DCA 2001) (holding special relationship existed between caregiver and developmentally disabled individual).