# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| MADHURI PATEL, individually and on behalf of AMANDA HINGORANI, a developmentally disabled minor,<br><br>Appellant,<br><br>v.<br><br>KENT SCHOOL DISTRICT, a Washington municipal corporation; KENT YOUTH AND FAMILY SERVICES, a Washington corporation and healthcare provider; MARNEE CRAWFORD, a healthcare provider; and DENNIS BALLINGER, a healthcare provider,<br><br>Respondents. | DIVISION ONE<br><br>No. 67711-0-I<br><br>ORDER CORRECTING OPINION |

The court finds that its opinion should be corrected, as follows:

The third and fourth full paragraphs of section III of the opinion shall be deleted and replaced with the following:

Here, the trial court admitted evidence of two incidents involving prior sexual conduct by Amanda. Dr. Shirley Feldman-Summers, a forensic psychologist and expert witness, was permitted to testify that Amanda had reported a prior sexual relationship with her cousin, Sunil Patel. According to KYFS reports, Amanda explained that she had "told [her cousin] I did not want to

No. 67711-0-I-I/2

[have sex] anymore because I did not want to have a messed up baby since we're cousins."

In addition, Feldman-Summers was permitted to tell the jury that Amanda had assertively sought to acquire birth control pills. According to KYFS reports, Amanda explained that she wanted "to go on birth control because Eric wants me to have a baby with him but I am not ready."

It is so ORDERED.

DATED this 3rd day of October , 2013.

Dwyer, J.

Spearman, A.C.J.

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2013 OCT -3 PM 4: 11

-2-

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

MADHURI PATEL, individually and on ) DIVISION ONE
behalf of AMANDA HINGORANI, )
a developmentally disabled minor, )
           ) No. 67711-0-I
          Appellant/Cross-Respondent, )
           )
          v. ) UNPUBLISHED OPINION
           )
KENT SCHOOL DISTRICT, )
a Washington municipal corporation; )
KENT YOUTH AND FAMILY )
SERVICES, a Washington corporation )
and healthcare provider; MARNEE )
CRAWFORD, a healthcare provider; )
and DENNIS BALLINGER, a healthcare )
provider, )
           )
          Respondents/Cross-Appellants. ) FILED: August 26, 2013
_____ )

DWYER, J. — This appeal arises from a lawsuit in which Madhuri Patel

sued the Kent School District, alleging that its negligent supervision of Patel's

daughter, Amanda Hingorani, had caused damage to both Patel and Amanda.[1]

At trial, Patel alleged that the District had breached its duty of care by failing to

prevent Amanda from engaging in sexual relations with another student in the

school bathrooms. Patel argued that Amanda, who had been diagnosed with

cognitive delays, was incapable of consenting to this sexual contact. Following a

---

[1] The parties both reference Amanda Hingorani by her first name throughout their briefing to the court. For the sake of consistency, we also adopt this convention.

six week trial, the jury found in favor of the District. By special verdict, the jury determined that, although the District had breached its duty of care, this breach was not a proximate cause of any injury to Amanda. The jury further determined that the District had breached no duty to Patel.

On appeal, Patel asserts that the trial court erred by instructing the jury to consider the percentage of fault attributable to Patel when assessing Amanda's alleged injuries. She further contends that the trial court erred by admitting certain evidence relating to Amanda's sexual history, that a guardianship order declaring Amanda to be legally incapacitated was improperly excluded from evidence, and that the trial court erred by utilizing criminal standards when instructing the jury on the definition of "sexual abuse." Finally, Patel contends that the trial court erred by denying her motion to amend her complaint to add a claim under RCW 74.34.035, a statute applying to the protection of vulnerable adults. None of these contentions has merit. Accordingly, we affirm the judgment entered on the jury's verdict in favor of the District.

I

Amanda entered Kentridge High School as a freshman during the 2005-06 academic year. Amanda, who had been previously diagnosed with cognitive and intellectual delays, was classified by the Kent School District as mildly mentally retarded.[2] As required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§1400-1490, an individualized education program (IEP) was

---

[2] The District has now abandoned its use of the term "mentally retarded" in favor of the term "developmentally delayed."

developed for Amanda. Amanda was thereafter enrolled in a combination of special education and general education classes.

In April 2006, Amanda's mother, Patel, discovered a series of e-mail exchanges between Amanda and several of her classmates. In the e-mails, students Eric Warren, Tayana Bryant, and Amanda Hedstrom urged Amanda to steal money from her mother in exchange for promises of friendship and sex. Amanda's romantic and sexual interest in Warren would be reciprocated, the students told Amanda, only if Amanda regularly delivered money to them at school. In one of the e-mail exchanges between Amanda and Warren, the two students utilized highly explicit sexual language to describe their sexual desires for one another.

Patel thereafter contacted school staff at Kentridge to discuss her concern that Amanda was being exploited at school. An investigation of these incidents was immediately initiated. After interviewing both Amanda and Warren, school officials concluded that no sexual encounters had occurred. Nevertheless, because Warren and Bryant each admitted to asking Amanda to steal money from Patel, they were both placed on long-term suspension. Neither student would return to Kentridge. Hedstrom continued to be enrolled at the school but signed a no-contact order prohibiting her from contacting Amanda.[3]

Following this incident, Amanda was moved to a more restrictive special education classroom setting. Amanda was placed in the "self contained"

---

[3] Amanda signed a reciprocal no-contact order, prohibiting her from contacting Hedstrom, Warner, and Bryant.

classroom of Francine Wilhelm, which was located in a separate building with only four classrooms. Special education students were the only students in Wilhelm's class. The school provided Amanda with escorts to walk her between classes and to and from the bus. Wilhelm volunteered to take her lunches with Amanda in the classroom. These restrictions continued for the remainder of Amanda's freshman year in school.

During this same time period, Amanda began counseling services at Kent Youth and Family Services (KYFS). Marnee Crawford was Amanda's counselor. In June 2006, Amanda admitted to Crawford that during her freshman year, she had in fact engaged in sexual intercourse with Warner. She told Crawford that several of these incidents had occurred in a school bathroom.

Crawford thereafter contacted her supervisor to determine whether either Child Protective Services (CPS) or the school should be notified. Crawford explained to her supervisor that she believed that Amanda had freely consented to the sexual intercourse with Warren and that Amanda understood the nature and consequences of her behavior. Because Crawford and KYFS did not believe that the incidents involved either sexual or physical abuse, they determined that there was no need to file a report with CPS. Moreover, because Amanda had requested that information regarding her sexual activities remain private, KYFS determined that the school would not be notified of Amanda's behavior in the school bathrooms.

The following fall, at the beginning of Amanda's sophomore year, Patel requested that the school continue the same restrictions that had been imposed

at the end of Amanda's freshman year at Kentridge. Patel met twice with school officials to discuss Amanda's IEP. Patel requested that, in addition to the previously imposed restrictions, the school also provide Amanda with constant one-on-one supervision. Patel did not, however, inform school officials that Amanda had engaged in sexual intercourse in the school bathrooms during the previous year.[4]

Crawford also attended both meetings with the IEP team. Crawford told the group that there were reasons to be concerned for Amanda's safety if she was left unsupervised. She stated that her concerns related to "lunch, passing times, and especially bathroom times." However, Crawford would not elaborate with respect to her specific concerns. Instead, she encouraged school officials to meet directly with Amanda.

Following these meetings, the IEP team determined that Amanda would remain in a restrictive special education classroom setting and that she would continue to receive escorts between classes. The team determined that Amanda would not, however, be provided with constant one-on-one supervision.[5] As Jennifer Grajewski, the director of special education at Kentridge, would later testify, because the IDEA requires that special education students be educated in the "least restrictive environment," such one-on-one monitoring can only be justified where a specific need is demonstrated. Based upon the information

---

[4] Patel learned of Amanda's sexual conduct in the school bathrooms in October 2006.

[5] Amanda's written IEP, in a section pertaining to "the concerns of the parents for enhancing the education of their child," provided: "[S]taff escorts Amanda to and from her classes. Upon arrival at school, Amanda is escorted to her first class. At days [sic] end she is walked to her bus. In this way, staff is able to provide the safety and close monitoring needed."

provided to the IEP team, constant one-on-one supervision was deemed inappropriate for Amanda.

In September 2006, Amanda was again enrolled in Wilhelm's self-contained special education classroom. Amanda was initially escorted to and from the girls' restroom, which was directly adjacent to Wilhelm's classroom. However, by the spring of 2007, Wilhelm determined that Amanda's observed behavior warranted fewer restrictions. In lieu of providing an escort for Amanda, Wilhelm began to simply monitor the clock during times that Amanda was out of the classroom using the restroom. Wilhelm would later testify that Amanda was never gone for more than five minutes.

In March 2007, Amanda began a relationship with another special education student, Matthew Mills. Mills, who was also enrolled in Wilhelm's class, asked Amanda "if she would be [his] girlfriend, and she said yes."[6] Mills was 18 years old and Amanda was 16 years old at the time this relationship began.

Between the months of March and April of 2007, Mills and Amanda had sexual relations at school on several occasions. These incidents occurred in the boys' bathroom. Mills would leave Wilhelm's classroom to use the bathroom.

---

[6] Amanda had previously been involved with Mills. In December of 2006, Amanda wrote a note to Mills in which she expressed her interest in him:

> Hey Matt. What's up with life. I really love you + like you lots! Do you have a cell phone so I can call you when I get my cell phone? I do want you to kiss me. Also I was wondering are you going to ask me out to homecoming? I love your hugs there [sic] so combortable [sic]. Do you want to do you know what whenever your [sic] ready. Write me back. I really miss you a lot and think of us! Ok bye! Loveya.

Several minutes later, Amanda would also leave the classroom. The two students would then go to the boys' bathroom. They would enter the stall that was farthest from the entrance. Mills would remove his pants, and either Mills or Amanda would then remove her pants and underwear. Mills would then attempt to put his penis into Amanda's anus. This was never successful. On one occasion, Amanda performed oral sex on Mills for approximately 1-2 seconds. Mills would later tell the jury that it was Amanda's idea to attempt anal sex because Amanda did not want to get pregnant.

On April 27, 2007, Assistant Principal Molly King discovered Amanda and Mills hugging in the school hallway. Mills was standing behind Amanda with his arms around her waist, and Amanda was leaning back against him, smiling. King immediately notified Wilhelm. The following week, Wilhelm observed Mills quietly leave the classroom approximately 30 seconds after Amanda had left to use the restroom. Wilhelm quickly followed Mills. She found Amanda in the girls' restroom washing her hands. Wilhelm thereafter escorted Amanda back to the classroom. Mills returned to class approximately three minutes later. Amanda was extremely angry with Wilhelm for interfering with her.

Wilhelm immediately notified Patel about the incident. In an e-mail dated April 30, 2007, Wilhelm told Patel that she believed that Amanda "may have been about to repeat some of the same behaviors in our bathroom with Matt that she engaged in last year." When Patel confronted Amanda about this incident later that day, Amanda told her mother that she had sex with Mills in the boys' bathroom on two occasions during the previous week.

Patel thereafter removed Amanda from school and contacted the police to report the incident. Detective Belinda Ferguson met with Amanda and Patel on May 16, 2007. Amanda told Detective Ferguson that "she liked Matt and he liked her." Amanda stated that Mills "asked her if she wanted to have sex, she agreed and the two went into the bathroom (boys) together." Detective Ferguson observed that "Amanda was very calm talking about the incident." When Detective Ferguson asked Amanda if Mills "forced her to do anything she didn't want to do, she said 'no.'"

On June 18, 2008, Patel filed a complaint for damages against the District. Patel alleged that the District was liable both for negligent supervision of Amanda and for failing to report the abuse or neglect of a child pursuant to RCW 26.44.030. Patel sought damages both for her own alleged injuries and on behalf of Amanda.

Trial began in June 2011. At the conclusion of six weeks of testimony, the jury determined that neither Amanda nor Patel had been proximately damaged by the acts or omissions of the District. With respect to Amanda's claims, the jury found that both Patel and the District were "negligent" but that proximate cause was lacking and that Amanda had suffered no damages. The jury also concluded that both Patel and the District failed to report reasonably suspected abuse or neglect but that these omissions did not proximately lead to any damages.[7]

---

[7] The District asserted that Patel, who as a nurse was required to report suspected sexual abuse pursuant to RCW 26.44.030, also violated the requirements of the statute.

With respect to Patel's individual claims, the jury determined that the District was not negligent and that Patel was not damaged.

Patel appeals and the District cross appeals.

II

Patel first asserts that the trial court erred by instructing the jury to consider the percentage of fault attributable to Patel when assessing Amanda's alleged injuries. She sets forth several bases for this contention. Patel contends, first, that she was entitled to parental immunity with regard to Amanda's claim for damages, second, that the court's instructions impermissibly allowed the jury to impute Patel's negligence to Amanda, and, third, that the relevant instructions were inconsistent and irreconcilable. However, because Patel demonstrates no prejudice arising from these alleged errors, her assertions provide no basis for a grant of appellate relief.

Given the jury's special verdict findings, it is clear that the trial court's instructions regarding the apportionment of fault had no effect on the verdict in favor of the District. Although the jury determined that both the District and Patel had breached a duty owed to Amanda, it found that these actions were not the proximate cause of any injury to Amanda. The jury likewise concluded that although both the District and Patel had violated the law by failing to report suspected abuse or neglect, Amanda was not proximately injured by these violations. The jury found by special verdict that the amount of Amanda's noneconomic and future economic damages was $0.

Patel's assignments of error have no bearing on these dispositive jury

determinations. The jury was instructed that "'proximate cause' means a cause that was a substantial factor in bringing about the injury even if the result would have occurred without it."[8] Instruction 17. In determining Amanda's noneconomic damages, the jury was told to consider the "nature and extent of the injuries," her "loss of enjoyment of life," as well as "pain and suffering . . . experienced and with reasonable probability to be experienced in the future." Instruction 37. Future economic damages to be considered included the costs of "necessary medical care, treatment, and services." Instruction 37. Utilizing these instructions, the jury determined that Amanda had suffered no damages as a result of the acts or omissions of Patel or the District.

"Trial court error on jury instructions is not a ground for reversal unless it is prejudicial. An error is prejudicial if it affects the outcome of the trial." Stiley v. Block, 130 Wn.2d 486, 498-99, 925 P.2d 194 (1996) (footnote omitted). Here, the instructions that permitted the jury to consider the percentage of fault attributable to Patel when apportioning fault for Amanda's alleged injuries were unrelated to the jury's determination that Amanda was uninjured by the District's conduct. This determination was entirely independent of the question of whether either the District or Patel breached a duty to Amanda. Indeed, having determined that neither Patel's nor the District's conduct was a proximate cause of Amanda's alleged injuries, the jury never reached the question of whether to apportion fault to Patel.

---

[8] The jury was also instructed that "'proximate cause' means a cause which in a direct sequence unbroken by any new independent cause produces the injury complained of and without which such injury would not have happened." Instruction 16.

The alleged errors in the court's instructions had no effect on the jury's verdict in favor of the District. Accordingly, because Patel was not prejudiced by the asserted errors, appellate relief on this basis is unwarranted.[9] Thus, we need not further address the merits of Patel's claims in this regard.

### III

Patel next asserts that the trial court erred by admitting certain evidence relating to Amanda's sexual history. We disagree.

Evidence Rule (ER) 412 provides that in a civil case, "evidence offered to prove the sexual behavior or sexual predisposition of any alleged victim is admissible if it is otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." A trial court has broad discretion in ruling on evidentiary matters; the court's decision to admit or exclude evidence will be overturned only for a manifest abuse of that discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008).

Here, the trial court admitted evidence of two incidents involving prior sexual conduct by Amanda. Dr. Shirley Feldman-Summers, who counseled Amanda at KYFS, was permitted to testify that Amanda had told her of a prior

---

[9] Patel contends that, because it is impossible to know what effect inconsistent instructions may have on a verdict, prejudice is presumed in instances where the trial court gives irreconcilable instructions. However, this is true only where the contradictory instructions pertain to a material issue in the case. See Hall v. Corp. of Catholic Archbishop of Seattle, 80 Wn.2d 797, 804, 498 P.2d 844 (1972). Here, given the jury's determination that Amanda was uninjured by the actions of either the District or Patel, the percentage of fault attributable to Patel was not a material issue reached by the jury in this case. In such circumstances, reversal is unwarranted. See Miller v. Alaska S.S. Co., 139 Wash. 207, 212, 246 P. 296 (1926) ("Inconsistent instructions, to work a reversal, must be prejudicial to the party complaining before such a result will follow.").

sexual relationship with Amanda's cousin, Sunil Patel. Amanda explained to Feldman-Summers that she had "told [her cousin] I did not want to [have sex] anymore because I did not want to have a messed up baby since we're cousins."

In addition, Feldman-Summers was permitted to tell the jury that Amanda had assertively sought to acquire birth control pills. Amanda told Feldman-Summers that she wanted "to go on birth control because Eric wants me to have a baby with him but I am not ready."

In explaining its ruling, the trial court noted that Amanda's capacity to consent to sex was an important issue at trial. Because there was no evidence that Amanda had been forcibly raped by Mills, Patel's theory of liability was that Amanda lacked the capacity to consent to the sexual contact.[10] Because the sexual contact was nonconsensual, Patel claimed, it was abusive. See C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wn.2d 699, 709, 985 P.2d 262 (1999) ("The alleged sexual abuse is essentially an element of the plaintiffs' negligence claims. Absent the abuse, plaintiffs would not have suffered any injury and their negligence claims could not stand."). Accordingly, in order to demonstrate that Amanda lacked the capacity to consent, Patel was required to prove at trial that Amanda was incapable of "understanding the nature or consequences of the act of sexual intercourse" at the time of the sexual contact. Instruction 34.

The trial court determined that the proffered evidence was highly relevant to this issue. Amanda's decision to end a sexual relationship with her cousin

---

[10] Amanda's capacity to consent was also relevant to Patel's claim that school personnel failed to report that Amanda had been subjected to sexual abuse.

because she believed that any children born of such a union would be at risk for birth defects tended to demonstrate her understanding of the nature and consequences of sexual intercourse.[11] Similarly, evidence that Amanda had sought to obtain birth control pills further indicated that Amanda understood the potential consequences of sexual intercourse. Indeed, as Feldman-Summers later testified, Amanda also demonstrated an understanding that condoms are used to prevent sexually-transmitted disease, an additional potential consequence of sexual contact.

With regard to the danger of unfair prejudice or harm to the victim, the trial court noted that this evidence was not being introduced to prove propensity. This was not a case, the court explained, in which evidence of a victim's past sexual conduct was offered to demonstrate that the victim had also consented in the current case. To the contrary, there was no dispute that Amanda willingly engaged in the sexual conduct in question. Instead, the issue was whether Amanda had the capacity to consent. Accordingly, the trial court ruled, such

---

[11] Patel relies upon our Supreme Court's decision in State v. Ortega-Martinez, 124 Wn.2d 702, 716, 881 P.2d 231 (1994), for the proposition that, in determining competency to consent, only evidence from the time of the sexual contact is admissible. That case held no such thing. Rather, the court simply noted that a person's capacity to consent must be evaluated as it existed at the time of the sexual contact. The court did not hold that only evidence from the time of the contact is relevant. To the contrary, particularly where a plaintiff asserts that a person's lack of capacity is a permanent condition, as Patel did here, even noncontemporaneous evidence tending to demonstrate that such capacity in fact exists may be highly probative.

Here, Amanda allegedly ended the sexual relationship with her cousin when she was only 12 years old. Accordingly, Patel contends that this event was too remote in time to be relevant to Amanda's capacity to consent at the time of the incidents involving Mills. However, it was Amanda's statements to her counselor and not her actual conduct that was probative of Amanda's capacity to consent to the contact with Mills. Amanda told her counselor about this incident on October 31, 2006, only five months before she began having sexual relations with Mills. Accordingly, this evidence was relevant to Amanda's understanding of the nature and consequences of sexual intercourse at the time that the more recent incidents took place.

- 13 -

evidence was unlikely to result in unfair prejudice or harm to Amanda.

Nevertheless, Patel asserts that evidence of prior sexual conduct is always irrelevant where the alleged victim suffers from a permanent lack of capacity. In support of this proposition, she relies upon our decision in State v. Summers, in which we explained that where a victim's "lack of capacity is based on a permanent, organic condition, it logically follows that prior acts of intercourse cannot demonstrate that the victim understands the nature and consequences because the prior acts may have occurred due to the same lack of capacity." 70 Wn. App. 424, 435, 853 P.2d 953 (1993).

Patel's reliance on Summers, however, is misplaced. Whether Amanda lacked the capacity to consent as a result of a permanent, organic condition was itself a hotly contested issue at trial. Moreover, in contrast to the issue presented in Summers, it was not the fact of Amanda's prior sexual activity that was deemed relevant by the trial court. Instead, it was the nature of Amanda's reasoning in deciding to terminate a sexual relationship and her reasons for later seeking birth control pills that bore on the question of her capacity to consent. The trial court correctly determined that this evidence was highly probative with regard to this issue. See State v. Frost, 141 N.H. 493, 502, 686 A.2d 1172 (1996) ("The issue the jury must decide is the complainant's mental capacity to choose whether to consent; the defendant is correct that evidence that she had exercised that mental capacity on prior occasions would be highly probative.").

In determining whether to admit evidence pertaining to Amanda's prior sexual behavior, the trial court properly applied ER 412. The court weighed on

the record the probative value of this evidence against the risk of unfair prejudice and harm to Amanda. The trial court did not abuse its discretion by determining that the evidence was admissible. There was no error.[12]

IV

Patel next contends that the trial court erred by excluding from evidence a copy of a guardianship order that declared Amanda to be legally incapacitated. We disagree.

Under ER 403, evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." A trial court's decisions regarding the admissibility of evidence are reviewed for abuse of discretion. State v. Vreen, 143 Wn.2d 923, 932, 26 P.3d 236 (2001). The trial court's balancing of the evidence's probative value against its prejudicial effect or potential to mislead is entitled to great deference. State v. Luvene, 127 Wn.2d 690, 706-07, 903 P.2d 960 (1995)).

Here, Patel moved to introduce the "Findings of Fact, Conclusions of Law and Order Appointing Guardian of Person and Estate," entered by a King County

---

[12] The trial court also determined that evidence of Amanda's sexual relationship with her cousin was relevant to the issue of Amanda's damages. At trial, Patel argued that Amanda's view of sexual relationships had become "distorted" as the result of her relationship with Mills and that she was thereafter vulnerable to further exploitation. The trial court determined that evidence of Amanda's prior relationship was relevant to the question of whether this alleged condition predated the incidents involving Mills at Kentridge. On appeal, Patel asserts that the trial court improperly deferred to the opinion of the District's expert in making this determination. To the contrary, in ruling on this issue, the trial court properly acknowledged that the District's expert's opinion was not the "standard of relevance" set forth by ER 412. Instead, the record indicates that the court thoroughly considered the language of the rule, the briefing of the parties, and extensive oral arguments prior to admitting the evidence for this purpose.

Superior Court judge, declaring Amanda to be legally incapacitated under Washington law. After evaluating this document, the trial court determined that the probative value of the guardianship order was substantially outweighed by the danger of unfair prejudice or confusion of the issues and, accordingly, excluded all evidence that such an order had been entered. On the other hand, the court noted that evidence of the facts underlying the determination of Amanda's legal incapacity would be admissible.[13]

The trial court did not err by so ruling. The court explained that the guardianship order was minimally relevant to the question of Amanda's capacity to consent to sex. A determination of legal incapacity, the court noted, is "arrived at under a different standard" than that utilized to determine a person's capacity to consent to sex. A person may be deemed legally incapacitated based upon his or her "demonstrated inability to adequately provide for nutrition, health, housing, or physical safety," RCW 11.88.010(a), or where the person is at significant risk of financial harm based upon an "inability to adequately manage property or financial affairs." RCW 11.88.010(b). Such findings are generally not relevant to the question of a person's capacity to consent to sex.

Furthermore, the trial court noted, this evidence was likely to confuse the jury. On the issue of Amanda's ability to consent to sex, the jury was ultimately instructed that "'[m]ental incapacity' means a condition that at the time of the sexual intercourse or contact prevents a person from understanding the nature or

---

[13] At trial, Patel did not choose to call as witnesses any persons involved in the determination of the guardianship for Amanda.

consequences of the act of sexual intercourse." Instruction 34. By contrast, the guardianship order stated that Amanda was legally "incapacitated." Given the substantial similarities between the language of the guardianship order and the language of the anticipated jury instruction (which was, in fact, given), the trial court determined that the jury might incorrectly conclude that the guardianship order had already resolved the question of whether Amanda lacked the capacity to consent to sex.

Finally, the court explained, admission of the order would be unfairly prejudicial to the District. "[J]udicial findings of fact 'present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.'" Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir. 1993) (quoting Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F. Supp. 1125, 1186 (E.D. Pa. 1980)); accord United States v. Sine, 493 F.3d 1021, 1034 (9th Cir. 2007). As the trial court properly determined, there was a substantial risk that the jury might assign inappropriate weight to the factual findings and order of a court.

The trial court's decision to exclude evidence of the order was based on tenable grounds and was eminently reasonable. There was no error.

V

Patel next contends that the trial court erred by utilizing criminal standards when instructing the jury on the definition of "sexual abuse." We disagree.

Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the

applicable law. In re Det. of Greenwood, 130 Wn. App. 277, 287, 122 P.3d 747 (2005); In re Det. of Twining, 77 Wn. App. 882, 894, 894 P.2d 1331 (1995). "Trial courts must define technical words and expressions used in jury instructions, but need not define words and expressions that are of ordinary understanding or self-explanatory." State v. Brown, 132 Wn.2d 529, 611-12, 940 P.2d 546 (1997). Whether a word is technical in nature is a question within the discretion of the trial court. State v. Guloy, 104 Wn.2d 412, 417, 705 P.2d 1182 (1985).

In this case, Patel asserted that Amanda was injured by the District's failure to report its knowledge of Amanda's sexual activities to certain authorities, as required by statute. The mandatory reporting statute, RCW 26.44.030, requires professional school personnel with "reasonable cause to believe that a child has suffered abuse or neglect" to report the suspected abuse to the Department of Social and Health Services (DSHS) or the proper law enforcement agency.[14] RCW 26.44.030(1)(a). The statute defines "[a]buse or neglect," in relevant part, as "sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety." RCW 26.44.020(1). "Sexual exploitation" is defined to include "[a]llowing, permitting, or encouraging a child to engage in prostitution" or "allowing, permitting, encouraging, or engaging in the obscene or pornographic photographing, filming, or depicting of a child." RCW 26.44.020(20). The statute does not, however, define the terms "sexual abuse" or "injury."

---

[14] Our Supreme Court has determined that there is an implied cause of action against a mandatory reporter who fails to report suspected abuse. Beggs v. Dep't of Soc. & Health Servs., 171 Wn.2d 69, 77, 247 P.3d 421 (2011).

Here, the trial court determined that the jury would benefit from a definition of the term "sexual abuse."[15] ("What do we do when the jury comes back and says, what is sexual abuse?"). Accordingly, the court instructed the jury that "'[s]exual abuse' means that a child has been the victim of an intentional sexual offense that is a violation of the Washington state criminal code." Instruction 31. The jury was told that "[c]onsensual sexual contact with another person by any person 15 years of age does not violate the Washington state criminal code when the other person is at least 13 years old and less than 19 years old."[16] Instruction 32. The jury was further instructed that a person lacks the capacity to consent where that person is incapable of "understanding the nature or consequences of the act of sexual intercourse" at the time of the sexual contact. Instruction 34.

Patel contends that, by so instructing the jury, the trial court improperly injected criminal standards into a civil case. She asserts that these instructions required her to prove that a criminal act had been committed in order to sustain her claims for violations of the mandatory reporting statute. This is not so. Rather, in order to demonstrate such a violation, Patel was required to prove only that a mandatory reporter "reasonably believed" that a violation of the criminal code had occurred. No proof of an actual crime was required. Moreover, Patel

---

[15] The trial court also instructed the jury regarding the statutory definitions of "abuse or neglect" and "sexual exploitation."

[16] The trial court further instructed the jury that neither "sexual contact between a person aged 18 years or older and a person age 16 years or older" nor "[c]onsensual contact between any person 16 years of age with another person 16 years or older" is a violation of our state's criminal code. Instruction 32.

remained free to argue that professional school personnel reasonably believed that Amanda had suffered injury under circumstances causing harm to her health, welfare, or safety. The jury was not instructed that such an injury must constitute a criminal violation.[17]

In addition, DSHS, the agency responsible for investigating reports made under chapter RCW 26.44, has expressly incorporated the criminal definition of sexual abuse within the Washington Administrative Code (WAC). WAC 388.15.009(3) provides that "[s]exual abuse means committing or allowing to be committed any sexual offense against a child as defined in the criminal code." An agency is entitled to great deference in cases where the agency has interpreted an ambiguous statute within its area of special expertise. Dot Foods, Inc. v. Dep't of Revenue, 166 Wn.2d 912, 921, 215 P.3d 185 (2009). The trial court properly relied upon this definition in instructing the jury regarding the

---

[17] In arguing that the instructions were proper, the District appears to assert that only sexual acts constituting violations of the criminal code give rise to a cause of action for negligence. Insofar as the District so contends, it is incorrect. The District relies upon our Supreme Court's decision in C.J.C. v. Corp. of Catholic Bishop of Yakima, 138 Wn.2d 699, 985 P.2d 262 (1999), for this proposition. In that case, the court stated that if alleged sexual abuse does not amount to a violation of the criminal code, then "no claim of any type, against any person, lies." C.J.C., 138 Wn.2d at 712. However, the court's decision in C.J.C. was limited to consideration of actions brought pursuant to RCW 4.16.340, which applies only where the plaintiff alleges damages for "childhood sexual abuse." 138 Wn.2d at 712. Because the statute expressly defines "childhood sexual abuse" as acts that would constitute sexual offenses under the criminal code, only where such acts are alleged is there a cause of action under that statute. The court did not, however, indicate that a plaintiff must demonstrate a violation of the criminal code in an ordinary negligence action. Indeed, as this court has noted in a similar context, it is irrelevant "that the particular injury that in fact occurred was a criminal assault or that it was sexual in nature." J.N. v. Bellingham Sch. Dist. No. 501, 74 Wn. App. 49, 59, 871 P.2d 1106 (1994).

Nevertheless, despite the District's argument on appeal, the jury was not improperly instructed. The jury was told that the District had "an affirmative duty to protect students in its custody from reasonably anticipated dangers." Instruction 10. It was not instructed that it must find a violation of the criminal code in order to determine that the District was negligent. Accordingly, there was no error.

meaning of "sexual abuse." There was no error in the jury instructions relating to this issue.

VI

Patel's final contention is that the trial court erred by denying her motion to amend her complaint to add a claim under RCW 74.34.035, a statute applying to the protection of vulnerable adults. The trial court determined that the statute applies only to the protection of adults. Because Amanda was only 15 and 16 years old at the time of the events underlying Patel's claims, the trial court determined that the statute was inapplicable and, accordingly, denied Patel's motion to amend her complaint. There was no error.

"The court's fundamental objective in construing a statute is to ascertain and carry out the legislature's intent." Arborwood Idaho, L.L.C. v. City of Kennewick, 151 Wn.2d 359, 367, 89 P.3d 217 (2004). Statutory interpretation begins with the statute's plain meaning. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). Plain meaning "is to be discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." State v. Engel, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009). If the statute is unambiguous after a review of the plain meaning, the court's inquiry is at an end. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). If, however, the statute is ambiguous, the court may then "look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent." Rest. Dev., Inc. v. Cananwill, Inc., 150

Wn.2d 674, 682, 80 P.3d 598 (2003).

The legislature enacted the vulnerable adult protection statute, chapter 74.34 RCW, based upon its finding that "some adults are vulnerable and may be subjected to abuse, neglect, financial exploitation, or abandonment by a family member, care provider, or other person who has a relationship with the vulnerable adult." RCW 74.34.005(1). "When there is reasonable cause to believe that abandonment, abuse, financial exploitation, or neglect of a vulnerable adult has occurred, mandated reporters shall immediately report to [DSHS]." RCW 74.34.035(1). Although the term "adult" is left undefined in the statute, this term is commonly defined in the law as a person who has attained the age of legal majority. BLACK'S LAW DICTIONARY 59 (9th ed. 2009). In Washington, the age of legal majority is 18 years old. RCW 26.28.010. Thus, the plain language of the statute indicates that the statute's protections apply only to persons who are at least 18 years of age.

Here, Patel does not contend that Amanda was an adult at the time of the events giving rise to this case. Instead, she asserts that the legislature intended that the vulnerable adult protection statute apply to other persons as well. She points out that the definition of a "vulnerable adult" includes a "person . . . [w]ho has a developmental disability as defined under RCW 71A.10.020." RCW 74.34.020(17)(c). Although the statute makes no mention of "children" or "minors" in any of its provisions, Patel asserts that, because Amanda is a person who has a developmental disability, the legislature must have intended that the vulnerable adult protection statute also apply to Amanda.

- 22 -

A cursory review of the statutory scheme belies this assertion. The protection of vulnerable adults was previously governed by several statutes, including former chapter 26.44 RCW. The former statute applied both to the protection of "adult dependent persons"—defined by statute as "persons over the age of eighteen years who have been found to be legally incompetent or disabled pursuant to chapter 11.88 RCW"—and to children under the age of 18 years. Former RCW 26.44.020 (6), (14) (1998). In 1999, the legislature determined that combining the various protections for vulnerable adults within one statute "would better serve this state's population of vulnerable adults." Laws of 1999, ch. 176, § 1. Accordingly, the protections originally afforded adults pursuant to chapter 26.44 RCW were removed from that statute and centralized (along with other such protections found elsewhere in the code) within chapter 74.34 RCW. Laws of 1999, ch. 176. Following these changes, chapter RCW 26.44 applied exclusively to the protection of children and chapter RCW 74.34 applied exclusively to the protection of adults.

Indeed, the final bill report relating to this act reflects this intent. This document explains that vulnerable adults in Washington include:

- adults over the age of 60 who lack the functional, mental, physical ability to care for himself or herself;
- adult clients of the Division of Developmental Disabilities;
- dependent adults with a legal guardian;
- adults receiving in-home care services; and
- adults living in a nursing home, adult family home, boarding home.

Final B. Rep. on Substitute HB 1620, 56th Leg., Reg. Sess. (Wash. 1999). There

is no indication that the legislature intended that the vulnerable adult protection statute also apply to children with disabilities.

Because Amanda was not an adult at the time of the events underlying Patel's claims, the trial court did not err by denying Patel's motion to amend her complaint to add a claim under RCW 74.34.035.

Affirmed.[18]

We concur:

---

[18] Given our determination that the jury's verdict in favor of the District should be affirmed, we need not address the issues set forth in the District's cross appeal.